BEFORE THE DEPARTMENT OF EDUCATION

CHAPTER 36 HEARING OFFICER

| | | |
|---|---|---|
| In the Matter of: | ) | |
| AMBER NAHALE | ) | |
| through her parents | ) | DECISION AND ORDER |
| Guy and Patricia Nahale | ) | |
|            Petitioner, | ) | |
| | ) | |
| vs | ) | |
| | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| STATE OF HAWAII | ) | |
|            Respondent | ) | |
| | ) | |

## DECISION

### Background

By completion of Form OASIS/SSS-Form 09 on August 30, 1999, an impartial hearing was requested by Patricia Nahale (hereinafter "Mother"), mother of Amber Nahale (hereinafter "Student"). On September 17, 1999, a pre-hearing conference was held. By agreement of the parties, the Hearing was held on October 18 and 19, 1999 and on October 25, 1999. Guy Nahale is the father of the Student (hereinafter "Father"). Mother, Father and Student (hereinafter collectively referred to as "Petitioner") were represented by Stan Levin of Davis Levin Livingston Grande. The School District's (hereinafter Department of Education "DOE", "Respondent" or "State") representative was Beth Shimmelfennig from the Windward Oahu District Office. Witnesses were: Dr. Barbara Bateman, Ms. Patricia Nahale, Dr. Bryna Siegel, Ms. Phyllis Ida, Ms. Barbara Ward, Ms. Jenny Wells, Mr. Carl Yoshimoto and Ms. Joanne Yamashita. Petitioner Exhibits 2,4,5,8 to 12,15 to 27,29 to 31,33 to 37,40 to 52, were entered into evidence. Respondent's Exhibits 1 to 3,4 to 29,32 to 36,39,and 44 to 67 were also entered into evidence. Prior to the start of the hearing Respondent presented a written Motion to Dismiss. Petitioner presented a written response. After arguement, the Respondent's Motion to Dismiss was denied. Petitioner presented a written Motion In Limine. Respondent presented a written response. After arguement, the Petitioner's Motion In Limine was denied.

Written closing arguements were presented on November 15, 1999. The decision was originally scheduled to be rendered on November 29, 1999. Prolonged, consecutive periods of illness and associated complications affected the Hearings Officer and delayed

EXHIBIT C

the issuance of the decision until February 2, 2000.

## Issues Presented

1. Has the Petitioner received a Free Appropriate Public Education (FAPE)?  NO
2. Has the Petitioner received an appropriate Notice of FAPE?  NO
3. Can the Petitioner be reimbursed for their expenses?  YES
       The total amount, up to July 1, 1999, to be reimbursed to Petitioner is $13,771.88.
4. Can Petitioner request future expenses?  YES
       The specific amount is yet to be determined.
5. How long is Petitioner entitled to funding?
       The specific length of time is yet to be determined.

## Findings of Fact

1. The Student was diagnosed with autism by Dr. Margaret Koven on April 10, 1997.  At the time of the diagnosis, Dr. Koven recommended several hours per week of discrete trial training. Dr. Koven also indicated that the Student's needs could be met by Windward Infant Development Program through Kapiolani Hospital.  Dr. Koven referred the Petitioners to Naomi Grossman at the Autism Project for an introduction to discrete trials training (DTT).  State Exhibit 7.

2. The evidence is unclear as to what resulted from Dr.Koven's referral to Naomi Grossman.

3. At approximately the same time, Student's father received a mainland job offer.  He took a trip to the mainland in part to check of agencies and types of available autism programs. The Father was provided with a list of possible mainland agency contacts by personnel of the Department of Health (DOH). Transcript, p.147.

4. The Father, while inthe mainland, developed an association with an organization called FEAT (Families for Effective Autism Treatment) that utilized discrete trial training. This organization recommended Dr. Ronald Leaf of Autism Partnership who did work in Hawaii.  Petitioner contacted Dr. Leaf who agreed to give an individualized curriculum for the Student.  Transcript, p.148.

5. Dr. Leaf informed Petitioner that the State of Hawaii had contracted to bring himself to Hawaii for DTT and autistic children.  DOH personnel arranged for the Petitioner to attend Dr. Leaf's training.  Dr. Leaf subsequently provided Student's individualized curriculum and consults.  Transcript, p.148 to 149 and 170.

6.  During the development of the Individualized Family Service Plan (IFSP) on September 29, 1997, the Student's parents indicated that they wanted "Lovaas method therapy at home" and that they were seeking "reimbursement for the cost of Dr. Leaf's Autism Partnership workshop including air, hotel, car rental and meals."

7.  The IFSP team determined that the family needed assistance in providing DTT. The IFSP team indicated that the family would receive discrete trial services from Hoahana, a local agency contracted by DOH. Also that the service coordinator would assist the family to find resources within the DOH's 0-3 program. There is no written denial of the Petitioner's request for reimbursement for the Autism Partnership workshop. Petitioner Exhibit 28.

8.  On November 20, 1997, Ms. Phyllis Ida, responsible for the coordination of the Student's program from DOH to DOE and member of the IFSP team, was aware of the Student's parents contact with Autism Partnership and the Petitioner's request for more one on one DTT services in the home. Ms. Ida observed the home program on this date. Transcript, p. 206 to 209.

9.  The Student was found eligible for special education services on November 25, 1997. State Exhibit 19.

10. A January 8, 1998 IFSP review noted Hoahana and DTT volunteer trainers will be coordinating services through Student's parents. Also that Hoahana will work with Family Guidance and DOE workers to determine services after January 17, 1998. Petitioner Exhibit 28,

11. On January 13, 1998 aninitial IEP was developed. The IEP made specific reference to a DTT home trainer. There is no written denial of the Petitioner's request for reimbursement for the Autism Partnership workshop. State Exhibit 19.

12. The school district (DOE) is responsible for FAPE. The DOE is responsible for any DOH failure to provide FAPE during its 0-3 or transition program. Transcript, p. 209 to 213.

13. A mental health service plan, by Hoahana, dated February 20, 1998 was developed. One of the measurable objectives to be addressed was the development of a home program based on Ron Leaf/TEAACH curriculum. Petitioner Exhibit 24. Reference to a home program based on Ron Leaf/TEAACHcurriculum also appears on the April 3, 1998 review of the mental health service plan. The October 16, 1998 review also references Leaf and TEAACH principles.

14. An IEP review dated April 3, 1998 references home tutoring until the Student is able to enter school. Petitioner Exhibit 25. There were further IEP reviews on May 5, 1998 and

November 6, 1998. There are no written rreferences to
Autism Partnership or DTT.

15. Ms. Kerina Oshiro prepared the Student's Program and Program
Outline dated December 23, 1998 and used it to show the
Autism Partnership consultant the Student's home program.
State Exhibit 48. Ms. Joanne Yamashita, the Student's
teacher and an IEP team member acknowledged that the Student's
Program and Program Outline dated December 23, 1998 was the
actual home program utilized by the Student.

16. The IFSP dated January 9, 1999 specifically indicated that
the Student's family and team have consulted with Dr. Koven
of Hoahana and the Ron Leaf trainers and have developed
the plan. State Exhibit 49,

17. The IEP dated January 29, 1999, Present Levels of Performance
part, Section III Social/Family Information section indicates
that consultations and training were ongoing by Autism Partner-
ship greatly contributing to the Student's progress. The
IEP team agreed to the need and programs in both the home
and school. The IEP team also discussed the need to secure
funding for inservice or training and consultation for parents
and teachers. Tom Smith, case manager from Hoahana, will
get funding and recovery for the costs of Autism Partnership
training or consultation. State Exhibit 28.

18. A written request for reimbursement of past expenses and future
costs is contained in a letter from the Student's parents to
Dr. Paul LeMahieu dated July 2, 1999. State Exhibit 59.
No written response from Dr. LeMahieu or from any DOE or DOH
personnel was presented.

19. Ms. Phyllis Ida indicated she never gave the family written
notice that DOE was refusing to pay for the Autism Partnership
program and its associated costs. Transcript, p. 241 to 242.

20. The Student's mother was not informed or aware of her family's
right to be provided with Autism Partnership or arelated
program paid for by the DOE. Transcript, p.141 and 401.

21. Student's mother had the home program cirriculum from Ron
Leaf from 1997. Petitioner had a contract with Autism Partner-
ship from 1997. The Petitioners have personally paid for the
Autism Partnership program and its associated costs since 1997.
Petitioner Exhibit 45 and supporting files.

22. Student's mother was first aware of the right to reimbursement
in July 1999 from another family with similiar educational
needs. Transcript, p.142.

23. Ms. Ida did not know the Student's parents were paying for Autism Partnership and its associated costs until February 1999. Ms. Ida assumed Hoahana was paying for Autism Partnership and its associated costs. Transcript, p.231 to 232.

24. Ms. Joanne Yamashita acknowledged that Autism Partnership is a part of the home program. Ms. Yamashita knew that there were ongoing Autism Partnership consultations. She saw the home program in November, December 1998. The Student's home program is a part of the Student's IEP. Transcript, p.363 to 378.

25. The Petitioners have requested $17,267.97 be reimbursed based on their personal payments for Autism Partnership and its associated costs. This amount reflects the costs incurred up to July 1, 1999. Petitioner Exhibit 45 and supporting files.

Conclusions of Law

The State has the burden of proving it met its legal obligations toward Petitioner with regard to IDEA. Seattle School District No. 1 v. B.S., 82 F.3d 1493, 1498(9th Cir. 1996). Clyde v. Puyallup School District, 34 F.3d 1396(9th Cir. 1994).
In this case the parties stipulated and agreed that the present levels of performance, goals, objectives, and the time amounts of services as set forth in the January 13, 1998, April 3, 1998, May 5, 1998, November 6, 1998 and January 29, 1998 IEPs were appropriate.

1. Has the Petitioner received a Free Appropriate Public Education (FAPE)?

The United States Supreme Court in Hendrick District Board of Education v. Rowley, 485 U.S. 176, 201(1982) set forth the two part test to determine whether FAPE was provided. The first part is procedural compliance. The second part is whether the school district actually provided personalized instruction with sufficient services to permit the student to benefit educationally.
As to the first part of the test, the stipulation of the parties establishes that there was procedural compliance.
Analyzing the second part of the test there is significant evidence that the Student appropriately benefitted educationally from the personalized instruction. Dr. Bryna Siegel, a stipulated expert on sutism, reviewed the Student's files and IEPs and opinioned that the program the Student ended up receiving was appropriate. Ms. Joanne Yamashita, the Student's teacher and member of the IEP team, involved with the Student since August 1998 stated that the Student improved in all areas cognitively, socially and behaviorally. The improvement, Ms. Yamashita attributed to the Student's two part educational program. There was a home

program and a school program.  Both home and school programs were necessary.  Transcript, p. 359.  Ms. Phyllis Ida, IFSP team member whose role was to help transition the Student from the infant program into the DOE and involved with the transition from November 1997, felt taht the home and school programs were good and that they were working. Transcript, p. 241.

The weight of evidence establishes that discrete trial training through Autism Partnership was a part of the Student's home program.

Dr. Barbara Bateman, stipulated expert on IDEA, testified that discrete trial training was a specific training technique generally used with and approved for children with autism. Dr. Bateman also acknowledged that the Student's Programs and Program Outline dated December 23, 1998 was typical of a discrete trials training program.  Dr. Bateman acknowledged that Mr. Ron Leaf worked with one of the discrete trial training programs currently in use.  Dr. Bateman also indicated that autism was a complex, difficult disability where training procedures are going on in the parents home and that the parents are intimately involved on an hour by hour basis with the training.

Dr. Bryna Siegel looked at the Student's files and IEPs and acknowledged that the Student's program involved discrete trial training.  Dr. Siegel stated that the role of the parents in the home program was really quite important.  The parents must understand how the program is being taught, methods required and procticing the program th4mselves.

Ms. Yamashita acknowledged that the Student's Program and Program Outline dated December 23, 1998 was the actual Student's home program.  Ms. Yamashita also stated that two of the goals from the home program were part of Student's IEP dated January 29, 1999 (Annual Goals 2B and 5B).  Transcript, p.363 to 364.  There is specific reference in the Comments section of Annual Goal 2B identifying that goals and objectives willbe accomplished at home with discrete trial training programs.

Ms. Ida acknowledged that the Student's parents had found out about the Lovaas program and wanted more services provided one on one in the home on November 20, 1997,  Ms. Ida knew that the Student's parents were contracting Autism Partnership for consul-tation services.  Transcript, p. 202, 206 to 209.

Student's mother stated that the IFSP team on September 29, 1997 was informed of the need to get the Autism Partnership consultation to ensure an appropriately structured education using the discrete trial training method.  Transcript, p.96 and Petitioner Exhibit 28.

Ms. Kerina Oshiro, functioning in part as the Student's skills trainer and consultant for the home program since 1997 to the pre-sent, prepared the Student's Programs and Program Outline dated December 23, 1998 (State Exhibit 48).  Ms. Oshiro used it to show the Autism Partnership consultant the Student"s home program. Transcript, p.152 to 155 and 170.

Ms. Jenny Wells, the autism consultation teacher for the Windward District acknowledges that the ongoing consultation/training by Autism Partnership was part of the present levels of performance in the Student's IEP dated January 29, 1999. Transcript, p. 295.

Of particular importance to note are the statements found in the Student's IEP dated January 29, 1999. State Exhibit 28. In the Present Levels of Performance part, III. Social/Family Info section it states:

"Consultation/training ongoing by Autism Partnership greatly contributes to progress. Team agrees to need and programs in home/school".

In the Conference Information and Notes section it states:

"Discussed need to secure funding for inservice/training and consultation for parents and teachers. Tom Smith will work w/parents to get funding and recovery for costs of Autism Partnership training/consultation."

Ms. Ida indicated that the Student's entire IEP dated January 29, 1999 was the agreement the state had with the Student's parents. Ms. Ida stated that the Student's home program was presented as a model to other teachers. Also, Ms. Ida knew that other teachers were calling the Student's parents and asking to come over and see the home program and materials. Transcript, p. 227, 253.

Ms. Yamashita and Ms. Wells indicated not everything that has to be purchased has to be an IEP decision. Transcript, p.294 and370.

The Autism Partnership training/consultation and associated costs of the Student's home program were not provided for by the State.

The Student's mother testified taht the DOE did not indicate they would pay for anything during the IEP meeting on January 13, 1998. She further indicated taht after the January 13, 1998 IEP meeting, the DOE did not bring over furniture, books or materials. The DOE did not provide for all the therapists, any consultation or a curriculum. The Student's parents had a contract with Autism Partnership and a curriculum from 1997. The Student's parents paid for all those items indicated in Petitioner Exhibit 45, a total of $17,265.97 up to July 1, 1999. Transcript, p.99, 393 to 395. Ms. Ida, Ms. Yamashita and MS. Oshiro did substantially corroborate the fact that the DOE did not provide for those cost items listed in Petitioner Exhibit 45.

Based on the evidence adduced at hearing, the Petitioner did not receive FAPE. The DOE did not provide personalized instructions with sufficient services at no cost to the Petitioners.

2. Has thePetitioner received an appropriate Notice of FAPE according to the provisions of IDEA?

Under IDEA, the DOE is required to make a written offer

7

whether or not the parents are willing to consider placement or the provision of a free appropriate public education. 34 C.F.R. 300.503. Unified School District v. Smith, 15 F.3d 1519 (9th Cir. 1990). The Ninth Circuit has held that a school district must give prior written notice to parents when it proposes or refuses to initiate or change the educational placement or the provision of a free appropriate public education. Smith at 1526.

Hawaii Administrative Rules. Title 8 Department of Education, Chapter 36 Provision Of A Free Appropriate Public Education For Exceptional Children With Disabilities, Section 8-36-5 Prior notice states in part:

"(a) Any proposal or refusal to initiate or change the identification, evaluation, program, placement or the provision of a free appropriate public education shall not be undertaken without first providing written notice to the parents and the opportunity for a hearing in accordance with this chapter.
(b) Written notice shall be sent to the parent when the department:
    (3) Proposes to develop, review, or revise, a child's individualized educational program;
    (5) Refuses to do any of the above at the request of the parent."

Ms.Ida stated that the Student's entire entire IFSP (Petitioner Exhibit 28) was the agreement the State had with Student's parents. Within that IFSP is the parents request for Lovaas method therapy at home through Autism Partnership and reimbursement for Autism Partnership's workshop, air, hotel, car rental and meals. Ms. Ida further indicated she never gave the family written notice that DOE was refusing to pay for the Autism Partnership program and its associated costs. Transcript, p.241 to 242 and 253.

The need to secure funding for inservice/training and consultations for parents and teachers arose again during the Student's IEP dated January 29, 1999. Tom Smith was to work with the parents and get funding and recovery for costs of Autism Partnership training and consultations. Student's parents as of October, 1999 have had no response to their requests for funding and recovery of costs. Transcript, p. 420.

A further request for reimbursement of past expenses and future costs was made to the State in a letter addressed to Dr. Paul LeMahieu dated July 2, 1999. State Exhibit 59. There is no evidence of a written refusal to the reimbursement and future costs request.

Based on the available evidence, the Petitioners were not given the appropriate notice regarding FAPE.

3. Can Petioner be reimbursed for their expenses?

8

In <u>Burlington School Committee of the Town of Burlington v.</u> <u>Dept. of Education of Massachusetts</u>, 471 U.S. 359 (1985) and <u>Florence County School District Four v. Carter</u>, 510 U.S. 7 (1993) The U.S. Supreme Court established a two step test under IDEA for cases where the parents unilaterally placed their disabled child in a private school or other seperate setting and seek reimbursement of their expenses. The first step is that the placement proposed by a school in an IEP was not appropriate. The second step is that the alternate placement into which the parents put their child was appropriate.

Although this case is not a unilateral placement case consideration of the Burlington tests would help in an equity analysis.

The stipulation of the parties and the uncontroverted evidence establishes that the program the Student ended up receiving was appropriate. Autism Partnership and its contributions to the Student's home program are an essential part of the program the Student received. Therefore a proposal by the DOE that did not include Autism Partnership's services would not be apporpriate. The utilization of Autism Partnership by the Student's parents was appropriate.

In this case, evidence establishes that the Student's parents did make requests for reimbursement for Autism Partnership associated costs on September 29, 1997, January 29, 1999 and on July 2, 1999. There is no evidence in the record of a written DOE refusal to the Petitioner's reimbursement requests. From September 29,1997 to the present, various members of the Student's IFSP snd IEP teams were aware of Autism Partnership's involvement with the Student's home program. On January 29, 1999 the IEP team agreed to the need and programs in the Student's home and school. As of that date funding and recovery for Autism Partnership training and or consultations were still being worked on.

Equity requires that the Petitioners receive reimbursement of their expenses in order to satisfy the State's obligation to provide FAPE.

The following case and administrative rule relate to reimbursement amounts. <u>In Re: G.</u>, 27 IDELR 451, 466, indicates that reimbursement "is not authorized except for actual expenses incurred to enable a disabled child to receive educational benefits." In this case the reimbursement requests identified in Petitioner Exhibit 45 and its related files must be analyzed by this standard.

Another consideration is Hawaii Administrative Rules, Title 8 Department of Education, Chapter 36, Section 8-36-13(c) which states that the "individualized educational program shall be implemented as soon as possible following the meeting." Here, the Student's parents requested reimbursement for Autism Partnership associated costs on September 29, 1997. The Student's parents should have at least received a written refusal to reimburse for Autism Partnership associated costs by the initial IEP on January 13, 1998. Therefore reimbursable costs should be allowed from January 13, 1998.

Based on the above considerations Petitioner Exhibit 45 and its supporting files and documents are analyzed as follows.

Therapy items which consists of the material things needed for therapy (ie. flashcards, counters, crayons, etc.) will be reimbursed if purchased from the January 13, 1998 IEP. Both Dr. Siegel and Dr. Bateman indicated that a great many, varied, stimulating and constantly changing sets of materials were essential to a DTT program. Ms. Oshiro stated that the Student's parents and not the DOE provided these therapy items. Ms. Yamashita corroborated that DOE did not purchase these items.

Reinforcers, office supplies, books, photo processing, member conference, copies, tickets, tapes of conference, subscriptions, videos are also reimbursable if after January 13, 1998. In this case, reinforcers (ie. food items, little toys, etc.) were used only for program purposes. The reinforcers used to reward the child for appropriate behavior had to be constantly rotated and new reinforcers identified. Office supplies, used for program purposes or parent or trainer training are reimbursable. Photo processing used for Autism Partnership's matching program or as reinforcers are reimbursable. Member conferences for parent or trainer training are reimbursable. Copies were for Autism Partnership material or curriculum or of the Student's program notebook currently in use. These copy costs are reimbursable. Tickets were identified as transportation costs to attend autism conferences and are reimbursable. So to are the tapes of the conference workshops reimbursable. The subscriptions were for autism related journals and videotapes, were required to keep track of the Student's development, teacher and therapist assessment, consultation and program development. The subscriptions and videotapes are reimbursable.

Furniture and equipment from January 13, 1998 are reimbursable. In this case there is a seperate locked school/therapy room which includes child size tables and chairs, file cabinets, catalogs for materials, etc. These items were used only for program purposes.

The computer is to be reimbursed. Dr. Bateman indicated that computers are sometimes involved as a necessary and reasonable part of the equipment for autism students. Dr. Siegel stated that a computer is not required where data can be recorded manually. In this case the Student's parents and home program team used the computer to communicate with each other and Autism Partnership for information, consults and scheduling. The computer was specifically used for the Student's program (ie. interactive imitation), to generate curriculum data sheets and a program checklist. The Student's parent stated that 99% of the computer use is for the Student's home program.

Evidence indicates that the phone and consult items were attributable to Autism Partnership and are therefore reimbursable.

The item categories meals and miscellaneous are not reimbursable. Dr. Bateman stated that reimbursable costs need to be necessary to the program and reasonable in nature. Meals during a conference

are not necessary to the Student's program.  The miscellaneous item referenced to Burger King is also not necessary to the program.
     The hotel item referenced to Main Street Station for lodging is reimbursable.  The expense referenced to the Flamingo Hilton Reno is not necessary to the Student's program and is not considered reasonable.
     To recapitulate, the total amount, up to July 1, 1999, to be reimbursed to Petitioner by the DOE is $13,771.88.
     The disposition of the Student's parents claims for reimbursement by reference file name are as follows:

| Reference File Name | Amount Claimed | Amount Allowed |
|---|---|---|
| e1196 | $41.70 | 0    (1) |
| e497 | 23.49 | 0    (1) |
| e697 | 142.04 | 0    (1) |
| e797 | 60.04 | 0    (1) |
| e1197 | 20.44 | 0    (1) |
| e1297 | 243.38 | 0    (1) |
| e198 | 496.14 | $463.87 (2) |
| e298 | 157.47 | 157.47 |
| e398 | 1007.74 | 1007.74 |
| e498 | 199.38 | 199.38 |
| e598 | 889.48 | 680.93 (3) |
| e698 | 480.20 | 480.20 |
| e798 | 752.41 | 752.41 |
| e898 | 184.70 | 184.70 |
| e998 | 211.16 | 211.16 |
| e1098 | 19.02 | 19.02 |
| e1198 | 131.13 | 131.13 |
| e1298 | 37.20 | 28.97 (4) |
| e199 | 234.75 | 234.75 |

| Reference File Name | Amount Claimed | Amount Allowed |
|---|---|---|
| e399 | $19.35 | $19.35 |
| e499 | 72.23 | 72.23 |
| e599 | 57.29 | 57.29 |
| eReno | 1738.15 | 1609.41 (5) |
| ephone | 61.47 | 61.47 |
| eotheracct | 2570.77 | 2545.77 (6) |
| e1996 | 460.62 | 0 (1) |
| e1997 | 1941.66 | 0 (1) |
| e1998 | 443.59 | 443.59 |
| e1999 | 218.20 | 181.57 (7) |
| eaddl | 4244.95 | 4123.71 (1) |
| e699 | 70.43 | 70.43 |
| e299 | 35.39 | 35.39 |
| TOTALS | $17265.97 | $13771.88 |

Notes:

(1) Costs incurred prior to January 13, 1998.
(2) Costs incurred prior to January 13, 1998 total $32.27
(3) Costs for home/office binding system and $4.29 item not established.
(4) Costs for Foodland 10 Menehune Purified Drink not established.
(5) Costs for Best Burger, The Great S&P, Hilton, Burger King, Albertsons and Flamingo not established.
(6) Costs for Easter Seals not established.
(7) Costs aor Sears swimsuit and sleeping bag not established.

4.  Can Petitioner request future expenses?

In both <u>Burlington</u> and <u>In Re: G</u> at 468, the courts stressed that theIDEA authorizes equitable relief.  In this case, the Student's parents have requested an award for future expenses of approximately $780.00 per month for one year from the date of the hearing order.  The $780.00 per month request is based on past expenses the Student's parents claim to be reasonable and appro-priate.  The future expenses are to cover ongoing costs to maintain

the home program.  No discussions have occurred between the Student's parents and DOE regarding these future expenses.  Transcript, p. 125, 150 to 151.  State Exhibit 59, the parent's letter to Dr. LeMahieu, does state the need to be reimbursed for future Autism Partnership consults and other educational expenses.

The Hearing Officer has determined that the DOE has failed to provide FAPE to the Student in a timely manner.  Having prevailed, the Student is entitled to Autism Partnership consults during the pendency of administrative and judicial proceedings.  As to educational expenses other than Autism Partnership consults, after July 1, 1999, the Hearing Officer leaves this to be resolved between the DOE and Student's parents.  If the parties fail to resolve the issue of educational expenses, other than Autism Partnership consults, either party can request an impartial hearing.

The Petitioner is only entitled to funding for Autism Partnership consults for one year from the date of the hearing order or until such time as the DOE develops and provided FAPE to the Student, whichever occurs first.  No evidence has been presented as to how long the Student will require the home program. However, it is expected that the Student's needs will change over time.

The DOE is not constrained during its development and provision of FAPE to be limited to Autism Partnership consults. All that is required of DOE is that DOE fully provide and fund a home program designed to meet Student's needs.

Petitioner additionally claimed relief under Section 504 of the Rehabilitation Act.  Analysis of Petitioner's arguements establish that the relief requested is the same as that of the Chapter 36 action.  Accordingly the 504 request is denied.

## ORDER

1.  Petitioner and Respondent shall promptly convene an IEP meeting.  The DOE is to submit a program and services to provide FAPE to the Student.  Specifically, the IEP shall determine whether Autism Partnership and its associated costs will continue to be part of the Student's home program.

2.  Respondent shall reimburse Petitioner a total of $13771.88. This amount covers all reimbursable expenses up to July 1, 1999.

## RIGHT TO APPEAL

The parties in this case have the right to appeal this decision to a court of competent jurisdiction.  This appeal must be made within thirty (30) days of receipt of this decision.

Date:  Honolulu, Hawaii, February 2, 2000.

Ross A. Kozama
State of Hawaii
Due Process Hearing Officer

13