Of Counsel:
DAVIS LEVIN LIVINGSTON

STANLEY E. LEVIN      1152-0
MICHAEL K. LIVINGSTON   4161-0
Davis Levin Livingston
851 Fort Street, Suite 400
Honolulu, Hawaii 96813
Telephone: (808) 524-7500
FAX: (808) 356-0418
E-mail: slevin@davislevin.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PATRICIA N. and GUY N., Individually and as Guardians Ad Litem of AMBER N., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>PAUL LEMAHIEU, in his official capacity as Superintendent of the Hawaii Public Schools; BETH SCHIMMELFENNIG, in her official capacity as an Education Specialist; PHYLLIS IDA, in her official capacity as an employee of the Department of Education, State of Hawaii; and DEPARTMENT OF EDUCATION, STATE OF HAWAII,<br><br>Defendants. | CIVIL NO. CV 00-000252 DAE/LEK (Other Civil Action)<br><br>PLAINTIFF AMBER N.'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST REQUEST TO ANSWER INTERROGATORIES TO AMBER N. |

EXHIBIT A

## PLAINTIFF AMBER N.'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANT'S FIRST REQUEST <u>FOR ANSWERS TO INTERROGATORIES TO AMBER N.</u>

TO:    Gregg M. Ushiroda, Esq.
       Watanabe Ing & Komeiji
       First Hawaiian Center
       999 Bishop Street, Floor 23
       Honolulu, Hawaii  96813

       Holly T. Shikada, Esq.
       Deputy Attorneys General
       235 S. Beretania Street, Suite 304
       Honolulu, Hawaii  96813

       Attorneys for Defendants

   COME NOW, Plaintiff AMBER N., above-named, by and through her

counsel, DAVIS LEVIN LIVINGSTON, and hereby provides her second supplement to

responses to Defendant's First Request for Answers to Interrogatories to Amber N.

   DATED:  Honolulu, Hawaii, May 12, 2008.

             _____
             STANLEY E. LEVIN

             Attorney for Plaintiffs

## PLAINTIFF AMBER N'S SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORIES

1.  In regards to paragraph 13 of the complaint, please provide whatever information supported the contention that the following was true (i.e. Dates of conversations with individuals, literature that was read by the family, etc.):

Time was of the essence in providing Amber with the required program: because or rapid brain development, there was only a narrow window of time in which she could receive services which would allow her to benefit meaningfully from her education and eventually become self-sufficient. Without those services at a young age, her ability to communicate and have normal social skills would have been greatly diminished.

Answer:

Also, Dr. Ron Leaf at his seminar on 11/10/97, said that one of the criteria for recovery is to start treatment before the age of 4. He went on to say that the prognostic indicators are: early age of treatment, type of treatment and cognitive ability of the child.

"Let Me Hear Your Voice" was recommended to us by FEAT organization. In it in talking about Dr. Lovaas' work, …."his children were all very very young-under the age of three and a half, usually."…."neurologically, the brain is still forming. It still has a certain plasticity, malleability. The disorder has not progressed so far."

A January, 1997 back issue of "Reaching Out for our children" by FEAT of Southern Nevada was sent to us and in it, it said "Why ABA is FEAT's treatment of choice Lovaas' 1987 study
>Participants 4 yr. Old or less with diagnosis of autism
Subjects
19 in experimental group (40 hours a week one-on-one therapy for two years)
19 in control group (10 hours or less a week of one-on-one therapy for two years)
Results
>47% of the experimental group achieved normal educational and intellectual functioning
>They were indistinguishable from their peers

>2% of the control group achieved normal educational and intellectual functioning

2.  In regards to paragraph 20 of the complaint, please provide the specific elements of the discrete trial training program which were not provided including the date of the request, nature of the request, date of response, name of the responder, and the response.

Answer:

9/29/97: IFSP entry "I want or need Lovaas method therapy at home (Autism Partnership) and reimbursement for the cost of Dr. Leaf's (Autism Partnership) workshop, air, hotel, car rental, meals" Also, stated that we had already sent 500.00 deposit to Autism Partnership.
We were never reimbursed until the due process hearing. However, 0-3 did arrange for us to attend Dr. Leaf's week long workshop in November, 1997.

3.  In regards to paragraph 21, please describe in detail the alleged repeated failed requests to defendants to implement Amber's program, including but not limiting the description to when it was made, to whom it was made, in what manner was it made, who responded, when did they respond, and what was the response.

Answer:

9/29/97 IFSP entry. "I want or need Lovaas method of therapy at home (Autism Partnership) and reimbursement for the cost of Dr. Leaf's (Autism Partnership) workshop, air, hotel, car rental, meals" Also, stated that we had already sent 500.00 deposit to Autism Partnership. We were not reimbursed until the due process hearing.

As the Resource Teacher in charge of transitioning children into the DOE system after they turn 3, Phyllis Ida was aware of the IFSP and its contents. This matter of reimbursement was never addressed by her.

4.  In regards to the allegations in paragraphs 22 and 23 of the complaint, please describe in detail each event in which money was raised in order to implement the programs set forth in the IFSP and IEPS, including but not limiting the description to the type of event, the date of the event, the

2

individuals involved, the terms of any financial agreements, and how much money was raised by each event.

Answer:

See POD responses at P00044

5.    In regards to paragraph 33 of the complaint as to the January 1999 IEP, please describe in detail what your understanding of what the following text of the IEP Conference Note mean and why you believe the DOE/DOH completely failed to do this.

Discussed the need to secure funding for in-service training and consultation for parents and teachers.  Tom Smith will work with parents to get funding and recovery for costs of Autism Partnership training/consultation.

Answer:

Our understanding was that the team agreed that we should not be paying for the consultations and that we should be reimbursed for past expenses.

We believe that the DOE/DOH completely failed to do this because we never received reimbursement or funding of consultations until after we went to a due process hearing and won.

6.    In regards to paragraph 35 of the complaint, please describe in detail what information you have that "Beth Schimmelfenning, among others, have actual knowledge of these requests and she took no steps to correct this situation," including but not limiting this description to when this occurred, how did it occur, and how do you know this occurred.

Answer:

On February 03,1999 at 4:10 p.m., I spoke to Phyllis Ida and asked how we can get our consults paid for.  She said it needs to be in the IEP as to why it is necessary.  She said as long as the team agrees to this, the DOE must provide it.  She said I should try calling Felix Training Office for funding and DOH since the therapists are DOH people.  I asked her why the Adams were getting their consult paid for and she said it is because Beth Schimmelfenning authorized it.

3

February 04, 1999, JoAnn Yamashita sent a copy of the 1/99 IEP to Phyllis Ida. This IEP had the following included:
"Skills training/home therapy program supportive to school curriculum" "Ongoing support w/Autism Partnership beneficial to learning and home/school program. Consultation / training ongoing by Autism Partnership greatly contributes to progress. Team agrees to need and programs in home/school".

February 05, 1999 10:12 a.m. I spoke to Phyllis Ida and she said she did get the copy of the IEP and "it looks good" but DOE does not have any funds. I asked if we can't all sit down and see where the money can come from. I told her that we have been paying for this with garage sales. I told her I did contact Felix Training Institute and DOH. I asked her what is DOE's answer to me and she said "no funds".

February 08, 1999 8:40 a.m. I called Phyllis Ida and told her that Beth Yano of the DOH said that DOH cannot pay for it at this time but they support the idea and are willing to look at a cost share type arrangement. I told her I have still not heard back from the Felix Institute. I told her that I think Central DOE district will be using Sally Brierly of Autism Partnership when she comes and that the last time Sally was here, Sharron Manners of the Honolulu DOE district was interested in using Sally. I told her so how about the 3 districts teaming up and paying for the consult? Phyllis Ida again said the DOE does not have the money. She asked "where would the money come from?".

Although Phyllis Ida said that our IEP "looked good", she again stated that if the team agrees to it, the DOE will have to pay for it but she again said she does not know where the money will come from.

I asked her if she was aware that the last time Sally Brierly came (at our expense) she went into the DOE school and gave suggestions and she said yes. I told her then the DOE should have paid for it.

Phyllis Ida said that she would check with Beth Schimmelfenning again but I never heard back from her.

2/26/99 2:30 P.M. Phyllis Ida called me and said that she got my fax listing the 5 people I want to attend the CARD consultation that they are paying for Keanu

4

Adams. I knew the dates of the consult/workshop from Laurie Adams. Initially, Phyllis had said that she would like to invite our team to attend this. As the dates were confirmed by CARD, Laurie Adams told me that CARD was limiting them to 4 people attending for free an 5 or more people will be 75.00 per person. So, on this day, Phyllis called and said that she got my fax and the problem is that CARD is limiting them to only 4 people to attend. I told her I know but I also know that they will accept anything above 4 but there will be 75.00 per person charge. Phyllis said yes, so are you (Nahales) going to pay? I said no, DOE will pay. Phyllis said they are already going into the red for this workshop ad our people are DOH people. I said so are the Adams' people. I told Phyllis that this was not right, we always try to work with them and be team players. I reminded Phyllis that I had called all around to DOH and Felix as she had instructed since she said DOE did not have any money to fund our March, 1999 consult with Sally Brierly and that in the end, Amber's consult with Sally on 3/18 will only be 4 hours as a result of my having to bargain with the Felix Institute. She then "changed her tune" and said she will call us to advise on the exact dates since they may change.

3/01/99 Phyllis Ida called and said that now we can all attend. I told her how unfair I thought this whole thing was that the Adams get their consult paid for right off the bat (Laurie Adams had told me that they did not have to do anything to get this. Phyllis had just asked her what she wanted and she told her). I reminded her we are doing garage sales to raise money and why isn't Beth Schimmelfenning doing more to help us. I said Beth obviously does not know what it is like to have a special needs child. Phyllis later called me and said that she talked to Beth about our financial hardships and Beth told her "why don't we offer her (Patty Nahale) a job?." Phyllis said the position would be called "Coordinator" and would pay 15 or 16.00 / hr. or the same rate as a PTT. She said it would be 17 hours a week. The duties would be to coordinate DOE and home for families and write grants. She said then I could use their phones for long distance calls. She said that Amy Nakagawa has a grant book that could teach me how to write the grants and she mentioned a couple of other people – Gloria Kishi and Linda McCormick. She said then, the grant money could be used to benefit Amber.

At the due process hearing, Phyllis Ida admitted to giving her boss, Beth Schimmelfenning a copy of my letter addressed to Paul LeMahieu dated July 02, 1999.

5

7.    In regards paragraphs 36 & 37 of the complaint, please describe in detail how "[t]he recipients of the July 2, 1999 letter knew or should have known that the rights of the Plaintiffs were being violated, and failed to take appropriate action".

Answer:

The recipients of the July 2, 1999 letter knew that Amber's rights were being violated because the letter states that the IEP team agrees that the consultations are necessary. As a part of the IEP, the recipients knew that it was the DOE's responsibility to pay for this.

We state that we have been paying for all the materials, consultations and related materials for her education out of our own pocket. The DOE knows about FAPE and their responsibility to provide it to Amber.

The recipients failed to take appropriate action by failing to respond to this letter at all. The recipients also failed to take appropriate action by not reimbursing us or agreeing to assume educational costs for Amber until after we went to a due process hearing and won.

8.    Please list all special damages which you are claiming in this lawsuit, including but now limiting this description to identifying any items or services that you are claiming reimbursement for , the date the service or item was obtained, amount paid for the item or service, and the date on which it was paid for.

Answer:

Reimbursement for wages that were paid to my wife by her parents to replace the wages she would have received had she not had to quit her job of 10 years to implement the home program. This money helped us to keep our household going so that we could focus on the home program and still be able to pay for the things necessary for the home program such as furniture, reinforcers, materials and consultations.

As a result of having to pay for the implementation of the home program, we were unable to afford things that were necessary for our home and family:

6

The damages include but are not limited to the following:

| | | | |
|---|---|---|---|
| Patty's Salary | JAL Trading | 3,550.00/month x 7 | 24,850.00 |
| Patty's Salary | JAL Trading | 3,550.00/month x 12 | 42,800.00 |
| Patty's Raises | JAL Trading | 284.00/month x 9 | 2,558.00 |
| Patty's Salary | JAL Trading | 3,834.00/month x 3 | 11,502.00 |
| Patty's Medical | JAL Trading | 150.00/ month x 22 | 3,300.00 |
| Patty's parents helped w/funds | Parents | 1,030.00/month x 5 | 5,150.00 |
| Patty's parents helped w/funds | Parents | 2,430/month x 22 | 53,460.00 |
| Cousins donated money | Cousins | 6,000.00 | 6,000.00 |
| Aunty supplies household goods | Aunty | 50.00/month x 22 | 1,100.00 |
| Aunty supplies diapers | Aunty | 100.00/month x 22 | 2,200.00 |
| Patty's wages | K.G.A. | 160.00/week x 80 | 12,800.00 |
| Guy's deferred compensation | Police Department | 13,500.00 | 13,500.00 |
| Guy used family leave | Police Department | 3,500.00/month x 2 | 7,000.00 |
| Guy used sick leave due to stress | Police Department | 3,500.00/month x 2 | 7,000.00 |
| Guy had to forgo special duty jobs | Police Department | 140.00/week x 80 | 11,200.00 |
| Money for PICL that was used for consult | PICL | 1,750.00 | 1,750.00 |

9.     Please describe in detail your claims for general (including but not limited to emotional distress) and/or consequential damages in this lawsuit, including but not limiting the description to explaining each specific condition that you claim you otherwise would not have had and/or would otherwise not have been exacerbated, explaining in detail all facts concerning and supporting each claim, and identifying all witnesses (including but not limited to lay witnesses, treating physicians, family members etc) who may be able to verify or support each such claim.

Answer:

See Plaintiff's initial disclosures and supplemental disclosures filed herein for information on witnesses requested in this interrogatory.

Great emotional distress was caused by having to be a therapist, advocate, teacher, trainer, data keeper, human resources person, accountant and consultant for the home program.

Great emotional distress was also caused by having to run the program, fund the program, oversee and maintain the program.

Great emotional distress was caused by seeing other parents able to drop their children off at school and pick them up at the end of the day without worrying about finding educational personnel, training the educational personnel, overseeing the educational personnel, obtaining curriculum, materials and keeping records on educational issues. It was greatly distressing to see that those parents could then focus on doing other things for or with their children that I could not do because I did not have the time or energy to do so since I had to implement the home program.

Great emotional distress was caused by seeing that other parents did not have to hold garage sales or look for funding for their child's public education. They could spend their time on doing other things for or with their children.

Great emotional distress was caused by having to solicit donations from friends, co-workers, family and neighbors for garage sales to raise funds to implement the home program. Solicitations were made, items picked up, cleaned, priced, packed, displayed and sold. It was greatly distressing to know the tremendous sacrifices and hardships that family and friends were going through to help us raise these

8

funds. Friends and family would give up their weekends to stay all day and help us. One aunty even had to leave her disabled husband at home by himself in order to help us make sure that Amber's home program could be funded. It was also stressful to have our home turned into a warehouse for these garage sale items until the day of the sale. Storing boxes and bags everywhere made our daily life even more stressful.

Great emotional distress was caused by my trust in the DOE being shattered. My mother, aunties and close friends are all teachers in the public school system. I grew up believing that the DOE would always do what was right and lawful for the students it serves. Discovering that the DOE would turn their back on us and ignore our cries for help was a devastating reality for me to accept. To find that I had to change my entire life in order to implement the home program and that was actually the DOE's responsibility was crushing. To discover that when Phyllis Ida knew what we were going through, she did nothing was unthinkable. To discover that Beth Schimmelfenning had the power and the knowledge to correct the situation but deliberately chose to do nothing was unspeakable. To have the DOE's attorneys imply that Dr. Lamehiu is not responsible since he never had direct dealings with me is insulting.

Great emotional distress was caused by my having to give up my job of 10 years and the fulfillment I got from my career not to mention my income in order to do what the DOE was supposed to be doing.

Great emotional distress was caused by seeing my mother devote the majority of her fixed retirement income to keeping our household running in order for me to quit my job to run the home program.

Great emotional distress was caused by seeing my father push himself to work even though he was ill and exhausted until by the time he was diagnosed with lung cancer, he had only 1 month to live. He told friends and family that he had to keep working to help to support our household and keep our program running for the grandchildren's sake. It deeply saddened me and depressed me to see that he was never able to enjoy even one day of retirement because he had to work until the very end. I was emotionally distraught by this especially after finding out that this terrible circumstance could have been avoided had the DOE done what they are required to do by law.

9

Great emotional distress was caused by my having to worry about the implementation and home program while nursing my terminally ill father.

I am plagued with almost daily headaches. I am often unable to fall asleep or unable to sleep for long periods even though I am extremely tired. I am constantly thinking of all the things that are needed for the program or that need to be done before each session.

10. In regards to paragraph 43 of the complaint, please describe in detail how the DOE or its representatives directly discriminated against Amber, including but not limiting this description to when this occurred, by whom did this occur, and in what manner did this occur.

Answer:

The DOE directly discriminated against Amber because other children are provided teachers, furniture, and curriculum at no cost to their parents but we had to pay for all of this for Amber.

This occurred from 1997 when the in-home program was established. The DOE discriminated against us in knowingly allowing us to pay for all the furniture, curriculum, materials and consultations for the home program. They discriminated against us in not staffing the program.

This occurred by Phyllis Ida in 1997 by her failure to tell us that we should not be paying for Amber's education.

This occurred by Phyllis Ida in 1999 by her failure to pay for the home component of Amber's educational plan which she knew was in the IEP and agreed upon by the IEP team.

This occurred by Phyllis Ida in 1999 by her failure to respond to our 7/2/99 letter and helping to ensure that Amber's program was at no cost to us.

This occurred by Beth Schimmelfenning in 1999 when she failed to respond to our 7/2/99 letter or to make the situation right using the power of her position.

This occurred by Phyllis Ida and Beth Schimmelfenning in 1999 when they approved and paid for the same type of program for other families in the district.

10

This occurred by Phyllis Ida and Beth Schimmelfenning in 1999 when at the due process hearing, they said that Amber's program was supplemental vs. other families' programs.

11. In regards to paragraph 52 of the complaint, please describe in detail how the DOE was deliberately indifference to the needs and rights of Amber and her parents, including but not limiting this description to when this occurred, by whom did this occur, and in what manner did this occur.

Answer:

Phyllis Ida was deliberately indifferent when she was aware of the contents of Amber's IFSP in 1997 but chose to let the parents pay for the home component of Amber's education.

Phyllis Ida was deliberately indifferent when she came into our home in 1997 and saw the furniture and materials that we had purchased to implement the home component of the IEP for Amber but chose to let us continue to pay for everything.

Phyllis Ida was deliberately indifferent when she was aware of the garage sales that we were holding in 1999 but chose to let us continue to look for ways to provide Amber with the home component of her IEP.

Phyllis Ida was deliberately indifferent when she was aware of our 7/2/99 letter but chose to not respond.

Phyllis Ida was deliberately indifferent when she was aware of other families in the district as early as 1998 doing the same type of home program as Amber's and getting full funding but chose to let us continue to pay for the home program ourselves.

Phyllis Ida was deliberately indifferent when she was aware of Beth Schimmelfenning approving paid workshops for the Adams but chose to let us continue to pay for our consultations.

Phyllis Ida was deliberately indifferent when she was aware of the contents of the 1/99 IEP but chose to tell the Nahales that the DOE did not have the money to carry out what was stated in the IEP.

11

Beth Schimmelfenning was deliberately indifferent in 1999 when she chose to not respond to our 7/2/99 letter knowing full well that she had approved payment of a workshop for the Adams family in 4/99.

Beth Schimmelfenning was deliberately indifferent in 1999 when she chose to fight us at the due process hearing rather than sit down to discuss the issues as was offered.

12.    In regards to paragraph 53 of the complaint, please describe in detail how the DOE allegedly discriminated against Amber based on her disability, autism, including but not limiting this description to when this occurred, by whom did this occur, and in what manner did this occur.

Answer:

Phyllis Ida discriminated against Amber based on her disability in 1997 by allowing us to have paid without reimbursement and continue to pay for Autism Partnership consults.

Phyllis Ida discriminated against Amber based on her disability in 1997 by allowing us to pay for curriculum, furniture and materials for Amber's education knowing full well that other parents do not have to pay for curriculum, furniture or materials.

Phyllis Ida discriminated against Amber based on her disability in 1999 by allowing us to continue to pay for all of the educational expenses related to the home program even after receiving our 7/2/99 letter knowing full well that other parents do not have to pay for the educational expenses of their children.

Phyllis Ida discriminated against Amber based on her disability in 1999 by allowing us to continue to pay for the training and consultations of DOE/DOH people knowing that other parents do not have to pay for training of teachers of their children.

Phyllis Ida discriminated against Amber based on her disability in 1999 knowing that other parents are not being told that the DOE does not have the money to continue to publicly educate their children by telling the Nahales that the DOE did not have any money to pay for Amber's public education.

Beth Schimmelfenning discriminated against Amber based on her disability in 1999 knowing she had the power to make the situation right but choosing to continue to allow us to pay for Amber's educational expenses of the home program even after our letter of 7/2/99.

13.    In regards to paragraph 54 of the complaint, please describe in detail how Beth Schimmelfenning knew of discrimination against Amber but failed to remedy the situation, including but not limiting this description to when this occurred, in what manner did this occur, and what was the substance of the knowledge.

Answer:

Beth Schimmelfenning knew of the discrimination against Amber in 1999 when she received our 7/2/99 letter but did not respond.

Beth Schimmelfenning knew of the discrimination against Amber in 1999 when Phyllis Ida told her that we were paying for things with garage sales but failed to remedy the situation.

14.    In regards to paragraph 55 of the complaint, please describe in detail when and how Phyllis Ida knew in whole or in part "of the fact that the N [ ]'s were funding Amber's IEP program and directly providing services, but failed to remedy the violation of law, "including but not limiting the description to when this occurred, in what manner did this occur, and what was the substance of the knowledge.

Answer:

1997 Phyllis Ida, as the teacher in charge of transition from 0-3 to DOE, knew of Amber's IFSP.

1997 Phyllis Ida came to our home and already knew of our connection with Autism Partnership and saw the therapy room and all of the furniture and materials that we had provided.

On February 03, 1999 at 4:10 p.m., I spoke to Phyllis Ida and asked how we can get our consults paid for. She said it needs to be in the IEP as to why it is

13

necessary. She said as long as the team agrees to this, the DOE must provide it. She said I should try calling Felix Training Office for funding and DOH since the therapists are DOH people. I asked her why the Adams were getting their consult paid for and she said it is because Beth Schimmelfenning authorized it.

February 04, 1999, JoAnn Yamashita sent a copy of the 1/99 IEP to Phyllis Ida. This IEP had the following included:
"Skills training/home therapy program supportive to school curriculum" "Ongoing support w/Autism Partnership beneficial to learning and home/school program. Consultation / training ongoing by Autism Partnership greatly contributes to progress. Team agrees to need and programs in home/school".

February 05,1999,10:12 a.m. I spoke to Phyllis Ida and she said she did get the copy of the IEP and "it looks good" but DOE does not have any funds. I asked if we can't all sit down and see where the money can come from. I told her that we have been paying for this with garage sales. I told her I did contact Felix Training Institute and DOH. I asked her what is DOE's answer to me and she said "no funds".

February 08, 1999 8:40 a.m. I called Phyllis Ida and told her that Beth Yano of the DOH said that DOH cannot pay for it at this time but they support the idea and are willing to look at a cost share type arrangement. I told her I have still not heard back from the Felix Institute. I told her that I think Central DOE district will be using Sally Brierly of Autism Partnership when she comes and that the last time Sally was here, Sharron Manners of the Honolulu DOE district was interested in using Sally. I told her so how about the 3 districts teaming up and paying for the consult? Phyllis Ida again said the DOE does not have the money. She asked "where would the money come from?".

Although Phyllis Ida said that our IEP "looked good", she again stated that if the team agrees to it, the DOE will have to pay for it but she again said she does not know where the money will come from.

I asked her if she was aware that the last time Sally Brierly came (at our expense) she went into the DOE school and gave suggestions and she said yes. I told her then the DOE should have paid for it.

14

Phyllis Ida said that she would check with Beth Schimmelfenning again but I never heard back from her.

1999 Phyllis Ida received our 7/2/99 letter.

15.    In regards to paragraph 56 of the complaint, please describe in detail the "damages, including but not limited to lost wages and emotional distress" that the family has suffered.

Answer:

Reimbursement for wages that were paid to Patricia N. by her parents to replace the wages she would have received had she not had to quit her job of 10 years to implement the home program. This money helped us to keep our household going so that we could focus on the home program and still be able to pay for the things necessary for the home program such as furniture, reinforcers, materials and consultations.

As a result of having to pay for the implementation of the home program, we were unable to afford things that were necessary for our home and family:

The damages include but are not limited to the following:

| Patty's Salary | JAL Trading | 3,550.00/month x 7 | 24,850.00 |
| Patty's Salary | JAL Trading | 3,550.00/month x 12 | 42,800.00 |
| Patty's Raises | JAL Trading | 284.00/month x 9 | 2,558.00 |
| Patty's Salary | JAL Trading | 3,834.00/month x 3 | 11,502.00 |
| Patty's Medical | JAL Trading | 150.00/ month x 22 | 3,300.00 |
| Patty's parents helped w/funds | Parents | 1,030.00/month x 5 | 5,150.00 |
| Patty's parents helped w/funds | Parents | 2,430/month x 22 | 53,460.00 |
| Cousins donated money | Cousins | 6,000.00 | 6,000.00 |
| Aunty supplies household goods | Aunty | 50.00/month x 22 | 1,100.00 |

| Aunty supplies diapers | Aunty | 100.00/month x 22 | 2,200.00 |
|---|---|---|---|
| Patty's wages | K.G.A. | 160.00/week x 80 | 12,800.00 |
| Guy's deferred compensation | Police Department | 13,500.00 | 13,500.00 |
| Guy used family leave | Police Department | 3,500.00/month x 2 | 7,000.00 |
| Guy used sick leave due to stress | Police Department | 3,500.00/month x 2 | 7,000.00 |
| Guy had to forgo special duty jobs | Police Department | 140.00/week x 80 | 11,200.00 |
| Money for PICL that was used for consult | PICL | 1,750.00 | 1,750.00 |

Great emotional distress was caused by having to be a therapist, advocate, teacher, trainer, data keeper, human resources person, accountant and consultant for the home program.

Great emotional distress was also caused by having to run the program, fund the program, oversee and maintain the program.

Great emotional distress was caused by seeing other parents able to drop their children off at school and pick them up at the end of the day without worrying about finding educational personnel, training the educational personnel, overseeing the educational personnel, obtaining curriculum, materials and keeping records on educational issues. It was greatly distressing to see that those parents could then focus on doing other things for or with their children that I could not do because I did not have the time or energy to do so since I had to implement the home program.

Great emotional distress was caused by seeing that other parents did not have to hold garage sales or look for funding for their child's public education. They could spend their time on doing other things for or with their children.

Great emotional distress was caused by having to solicit donations from friends, co-workers, family and neighbors for garage sales to raise funds to implement the

home program. Solicitations were made, items picked up, cleaned, priced, packed, displayed and sold. It was greatly distressing to know the tremendous sacrifices and hardships that family and friends were going through to help us raise these funds. Friends and family would give up their weekends to stay all day and help us. One aunty even had to leave her disabled husband at home by himself in order to help us make sure that Amber's home program could be funded. It was also stressful to have our home turned into a warehouse for these garage sale items until the day of the sale. Storing boxes and bags everywhere made our daily life even more stressful.

Great emotional distress was caused by my trust in the DOE being shattered. My mother, aunties and close friends are all teachers in the public school system. I grew up believing that the DOE would always do what was right and lawful for the students it serves. Discovering that the DOE would turn their back on us and ignore our cries for help was a devastating reality for me to accept. To find that I had to change my entire life in order to implement the home program and that was actually the DOE's responsibility was crushing. To discover that when Phyllis Ida knew what we were going through, she did nothing was unthinkable. To discover that Beth Schimmelfenning had the power and the knowledge to correct the situation but deliberately chose to do nothing was unspeakable. To have the DOE's attorneys imply that Dr. Lamehiu is not responsible since he never had direct dealings with me is insulting.

Great emotional distress was caused by my having to give up my job of 10 years and the fulfillment I got from my career not to mention my income in order to do what the DOE was supposed to be doing.

Great emotional distress was caused by seeing my mother devote the majority of her fixed retirement income to keeping our household running in order for me to quit my job to run the home program.

Great emotional distress was caused by seeing my father push himself to work even though he was ill and exhausted until by the time he was diagnosed with lung cancer, he had only 1 month to live. He told friends and family that he had to keep working to help to support our household and keep our program running for the grandchildren's sake. It deeply saddened me and depressed me to see that he was never able to enjoy even one day of retirement because he had to work until the very end. I was emotionally distraught by this especially after finding out that this

terrible circumstance could have been avoided had the DOE done what they are required to do by law.

Great emotional distress was caused by my having to worry about the implementation and home program while nursing my terminally ill father.

I am plagued with almost daily headaches. I am often unable to fall asleep or unable to sleep for long periods even though I am extremely tired. I am constantly thinking of all the things that are needed for the program or that need to be done before each session.

16.    In order to facilitate the obtaining of further information about you from third – parties, please provide your full name, date of birth, social security number, and present address.

Answer:

Amber Ku'ualoha Kimika Nahale
1-17-95
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
1637 Kanapuu Drive
Kailua, HI  96734

17.    For the period January 17, 1995 until present, identify all of your treating physicians and/or other health professionals including but not limited to those providing psychological services.

Answer:

Dr. Marsha Marumoto – pediatrician
Dr. Brian O'hara – pediatrcian
Dr. Michael Hamilton – pediatrician
Dr. Erin Nakano – pediatrician
Dr. Mathew Lau – allergist
Dr. Margaret Koven – Psy.d
Dr. Cate Church – Develop mentalist

18

18.    Please a detailed description of the financial accounts held by you or your household members, including but not limiting that description to the name and address of the financial institution, the account number, the type of account, and the name under which the account is held, and the current balance.

Answer:

Honolulu Police Federal Credit Union
1537 Young St., 3rd Floor
Honolulu, HI 96826
Account number: 10398
Type: Savings & checking account
Name held under: Guy S. & Patricia N.F. Nahale

Aloha Pacific Federal Credit Union
Fka Honolulu City & County Employees Federal Credit Union
832 S. Hotel St.
Honolulu, HI 96813
Account number: 66470
Type: Savings & checking account
Name held under: Guy S. & Patricia N.F. Nahale

Bank of Hawaii
Hawaii Kai Branch
7192 Kalanianaole Hwy.
Honolulu, HI 96825
Account number: 0026252423
Type: Checking
Name held under: Joji Sano, Katherine K. Sano & Patricia N.F. Nahale

Bank of Hawaii
Hawaii Kai Branch
7192 Kalanianaole Hwy.
Honolulu, HI 96825
Account number: 0080-82667-2
Type: Checking
Name held under: Patricia N.F. & Guy S. Nahale

19