A20466E

BARBARA BATEMAN, Ph.D., J.D. VOLUME 1   JUNE 7, 2008

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4   PATRICIA N. and GUY N,            )
     individually, and as Guardian     )
 5   Ad Litem of AMBER N., a minor,    )
                                       )
 6             Plaintiffs,             )
                                       )
 7        vs.                          ) No. CV00-00252 MLR-LEK
                                       )
 8   PAUL LeMAHIEU, in his official    )
     capacity as Superintentent of     )
 9   the Hawaii Public Schools;        )
     BETH SCHIMMELFENNIG, in her       )
10   official capacity as an           )
     Education Specialist;             )
11   PHYLLIS IDA, in her official      )
     capacity as an employee of the    )
12   Department of Education, State    )
     Of Hawaii; and DEPARTMENT OF      )
13   EDUCATION, State of Hawaii,       )
                                       )
14             Defendants.             )
                                       )
15   _____

16         DEPOSITION OF BARBARA BATEMAN, Ph.D., J.D.,

17                    MILLBRAE, CALIFORNIA

18                      JUNE 7, 2008

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  JANE H. STULLER, CSR No. 7223, RPR

25   FILE NO.:  A20466E
```

Page 1


EXHIBIT A

1  off the top, have names of other organizations.
2      Q. Now, in Item No. 4 on Exhibit 5, you state that
3  "the Autism Society of America formally recommends
4  behavior therapy and no other therapy."
5          Do you see that?
6      A. Yes.
7      Q. Is behavior -- behavior therapy seems like a
8  very broad topic. But at least what does it encompass
9  in how you use it here?
10     A. It is a term of art.
11     Q. Uh-huh.
12     A. And it means intervention is based on the
13 behavioral principles as explicated with regard to
14 autism by Ivar Lovaas. I-V-A-R, L-O-V-A-A-S. And these
15 therapies have the characteristics that I've --
16     Q. Now, does behavior therapy, as recommended by
17 the Autism Society of America, only recommend those
18 based on the Ivar Lovaas method as -- for lack of a
19 better word?
20     A. That's very hard to answer. Because the
21 behavioral principles that Lovaas used in developing his
22 methodology are true regardless of whether he knew about
23 them or not. The behavior principles are there --
24 they're there, they exist whether J. B. Watson, who is
25 one of the early 1920s, 1930s, psychologists who brought

Page 50

1  more public awareness to these principles. But they
2  didn't really invent -- they didn't invent the fact that
3  human beings respond to reinforcement, you know.
4         So the principles on which behavior therapies
5  are based are there, they're true, but they have been --
6  they have been publicized, formalized if you will, by
7  huge numbers of people. B. F. Skinner was -- was one.
8  Certainly Watson was one. Lovaas most currently with
9  specific regard to autism.
10        But if, you know, somebody else -- you could
11 come up with a behavioral therapy, study the principles
12 of behavior change, as they're known to science, and
13 then you put them in a little package and put your name
14 on it and -- that -- anyone could develop a behavioral
15 program for change, as long as it kind of works like
16 this.
17        What's unique to the -- what's unique to the
18 behavior therapies in autism, I think, is the specific
19 things that are taught. You can use those principles to
20 teach anything. But with people who have autism,
21 teaching compliance and imitation and independent play
22 and spontaneous vocalization, those are real basics that
23 many children with autism don't have. And therefore,
24 they have to be taught those things that other kids
25 learn by being alive. They learn incidentally.

Page 51

1      Q. Okay. Now, it's -- you state that the Autism
2  Society of American formally recommends behavior therapy
3  and among other therapy.
4      A. Right.
5      Q. What other therapies are there that aren't
6  recommended by the Society?
7      A. Diet, vitamins. Started to say avoiding
8  vaccines. That would be considered a preventative, as
9  controversial as that is, not a therapy.
10     Q. Yes, I understand it is very controversial.
11     A. Yes. There are some -- what do they call them?
12 I want to say on the floor. That's not exactly the
13 right name. But there is a therapy that involves
14 literally trying to enter the child's autistic world.
15 And the text that talks about this features a photo --
16 photos -- or maybe they are from my own mind.
17        Anyway, you get on the floor with the child.
18 And I have this vivid image from somewhere, the child is
19 sitting there spinning plates. And I believe -- I
20 believe the author talked about one time when he or she
21 sat on the floor with an autistic child, there is
22 something like five hours doing nothing but spinning
23 plates. You join the child on the floor in his or her
24 autistic world. There are therapies that involve
25 holding the child, physically holding the child very

Page 52

1  tight.
2      Q. And again, these are therapies that are not
3  recommended by the --
4      A. By the Autism Society --
5      Q. Okay.
6      A. -- of America.
7      Q. Sorry to --
8      A. They are not necessarily -- the Society does
9  not -- I'm not -- I'm sorry -- this statement is not
10 intended to say what position -- no.
11        I'm trying to say this is the only one they
12 recommend. They don't nonrecommend the others. They
13 don't do anything. The only one they recommend is this
14 one.
15     Q. Okay.
16     A. Okay.
17     Q. Are there any of these other so-called
18 therapies you can recall?
19     A. I'm sure that there are, but -- those are the
20 ones that come to mind now. And some of them, it is
21 like one article, one person, one parent. And I
22 wouldn't really consider that as --
23     Q. Called a voice in the wilderness?
24     A. There you go.
25     Q. I'm sure there are many of those. And we need

Page 53

14 (Pages 50 to 53)

1  No. 3 we talked about.
2  No. 4 I did not rely upon.
3  And No. 5 is -- no, that covers the major.
4     Q. Okay. And with respect to issue two in the
5  hearing officer's order, "has the petitioner received an
6  appropriate notice of faith?" And answer, "no."
7     Is that with respect to the change in placement
8  from Enchanted Lakes to the home?
9     A. That's what I believed at the time that I read
10 this.
11    Q. Okay. Thank you for the clarification.
12    A. There may well have been other notice failures,
13 too, but that's the one I was specifically thinking of.
14    Q. Thank you for clarify, Doctor.
15    And let's go to your May '08 report, shall we?
16    A. Yes.
17    Q. If you go to the top of page 2, first
18 paragraph, does that fairly state what you -- your
19 understanding of what Mr. Levin asked you to do?
20    A. Yes.
21    Q. Okay. And that is to comment on the Nahale
22 facts in light of 504 of the Rehabilitation Act,
23 correct?
24    A. Correct.
25    Q. And you list three key facts; do you see that?

Page 82

1     A. I do.
2     Q. How did you come to the determination that
3  these were the key facts? What made you decide that
4  these were the three key facts?
5     (Witness examining document.)
6     A. The first one is the date when the parents
7  indicated they were seeking reimbursement. In my mind,
8  it's important that it be known that DOE was aware that
9  the parents were seeking reimbursement for the home
10 program. I don't know that that would legally change
11 anything, but it's important to me. I know for a
12 certainty that it --
13    Q. Well, that's what I'm trying to do is trying to
14 find out what facts you found were key or important to
15 you.
16    A. Okay. To me it is very important that there is
17 no dispute that DOE knew for many, many, many months
18 that the parents didn't have reimbursement and that they
19 needed it, and that they were providing the program.
20    It is also important that there is no dispute
21 about the appropriateness of the program, that both the
22 IFSP and the IEP team had approved it and recognized it
23 in -- in appreciable detail that that was an appropriate
24 program. Were that disputed, it would be a much
25 different case.

Page 83

1     Q. So you have no criticism of the program?
2     A. Absolutely not.
3     Q. Okay. I think it's -- I think the issue here
4  is that your criticism is that it wasn't appropriate --
5  it was an appropriate program --
6     A. But not free.
7     Q. -- but not a free program?
8     A. Exactly.
9     Q. Is that it?
10    A. That is it.
11    Q. Okay.
12    A. And No. 3, the failure of Lemahieu to respond.
13 And I guess I didn't incorporate what I had learned from
14 Houck that it was also addressed to DOH because
15 ultimately it is DOE not DOH that needed to respond.
16 And the fact that -- the fact that DOE doesn't respond
17 is incomprehensible to me.
18    And because it is incomprehensible, it just --
19 it just jumps out as extremely important. Again, there
20 is no dispute that the Nahales made that written
21 request. I -- I just don't get it.
22    Q. Okay.
23    A. To me it shows -- it shows what deliberate
24 indifference is and more.
25    Q. Okay.

Page 84

1     MR. USHIRODA: Do you need a spelling for
2  Lemahieu?
3     THE REPORTER: Yes.
4     MR. USHIRODA: L-E-M-A-H-I-E-U.
5     THE REPORTER: Thank you.
6  BY MR. USHIRODA:
7     Q. Now with respect to these keys facts that you
8  relied upon, are these key facts that Mr. Levin provided
9  with you, or is that just something you discerned based
10 on your review of the materials?
11    A. Based solely on my review, my -- entire
12 involvement with the case. These are the things that
13 stand out to me. No one ever suggested to me that these
14 were key in any way.
15    Q. Okay. Sitting here today, are there any other
16 key facts that you would have relied -- that you relied
17 upon that are not listed there?
18    MR. LEVIN: Objection; asked and answered.
19    THE WITNESS: DOE knew, the program is
20 approved, it didn't reimburse even though --
21 BY MR. USHIRODA:
22    Q. Didn't respond to your letter, the letter?
23    A. Yeah. And didn't reimburse until forced to.
24    If I understand your question, I think these
25 three are sufficient underpinnings for my opinions.

Page 85

22 (Pages 82 to 85)

**Page 98**

1  including the basis perhaps, among other things.
2     Q. And your reference to Ms. Ida's testimony is
3  that she said something to the effect that the DOE
4  doesn't put the refusals in writing?
5        MR. LEVIN: Objection; misstates testimony,
6  relevance.
7        MR. USHIRODA: Off the record.
8        (Brief interruption.)
9  BY MR. USHIRODA:
10    Q. Sorry, Doctor. Go ahead.
11    A. Phyllis Ida testified that DOE never gave the
12  Nahales any written refusal. And it is my belief that
13  that's -- that was her testimony.
14    Q. Did the DOE ever communicate their refusal to
15  reimburse the Nahales for the Autism Partnership in any
16  other means, by any other means?
17       MR. LEVIN: Objection; asked and answered,
18  relevance.
19       THE WITNESS: Yes, they did.
20  BY MR. USHIRODA:
21    Q. How, Doctor?
22    A. Told Mrs. Nahale to have a car wash if she
23  needed to. Tough luck that you can't afford this.
24  Yeah, they did.
25    Q. Who said that?

**Page 99**

1     A. I don't recall, but it was an DOE agent.
2     Q. Was it Ms. Ida?
3     A. I'm not sure. I believe it was either she or
4  Beth Schimmelfennig.
5     Q. Yes, that's correct.
6        Any other means by which the DOE conveyed its
7  refusal to reimburse the Nahales for the Autism
8  Partnership Program?
9        MR. LEVIN: Objection; relevance.
10       THE WITNESS: I would take their failure to do
11  so as evidence that they refused to do so.
12  BY MR. USHIRODA:
13    Q. Okay. You all right?
14    A. Yes, I am.
15    Q. You can take break. You can take a break now.
16    A. No, I'm fine.
17    Q. All right.
18    A. Deeply offended by the DOE, but fine.
19    Q. Doctor, we can take a break, you sure? Because
20  we are almost at lunch.
21    A. Positive.
22    Q. Okay. In a few more minutes then.
23       (Discussion off the record.)
24       MR. USHIRODA: Back on.
25    Q. I would just like to close with one thing

**Page 100**

1  before we break for lunch.
2        The next paragraph below that, Doctor -- oh,
3  wait, before we go on to that paragraph.
4        You know, you were kind of enough to give me an
5  explanation of what the DOE should have done to comply
6  with the notice requirements, correct?
7     A. Yes.
8     Q. And that, I take it, is based upon your
9  understanding of the applicable CFR?
10    A. Yes.
11    Q. Okay. And the applicable CFR is 34 CFR 104.36;
12  is that correct?
13       MR. LEVIN: Objection; asked and answered.
14       THE WITNESS: I believe we have to look at both
15  104.33 (b)(1)(ii) and 34 CFR 104.35.
16    Q. Okay. Thank you. Those two, correct?
17    A. Yes.
18    Q. Anything else?
19    A. No.
20    Q. Now, let's go on to the next paragraph.
21       You state -- basically what is that, what are
22  you trying to convey in that paragraph, Doctor?
23    A. That the best, perhaps the only to me,
24  meaningful way to compare what happened to Amber's
25  family or to Amber when the appropriate education was

**Page 101**

1  not paid for by DOE, it -- it's -- the count -- the
2  counterpart for me in general education would be if the
3  public school said to the family, yes, you can send your
4  child to school, but you have to pay for the teacher,
5  the teacher training. You have to provide the desk.
6  You have to provide the chalkboard. You have to provide
7  the curriculum. You have to teach the people how to do
8  the curriculum.
9        It was my effort to draw a parallel to what was
10  done to them, to what would be done if general ed --
11  what it would look like if general ed did -- did the
12  same thing.
13    Q. Were you trying to do this by a comparative
14  analysis?
15    A. Yes.
16    Q. Do you have an issue with the design of Amber's
17  program for the years in question?
18       MR. LEVIN: Objection; vague as to "issue."
19  BY MR. USHIRODA:
20    Q. I'm talking about the years from '97 to 2000.
21  I think that's the time period in question. If you are
22  thinking of a different time period, let me know.
23    A. No. No, I don't.
24    Q. Your answer was in with respect to my time
25  period or to the -- to design?

**Page 122**

1  been an appropriate program in the instances where she
2  and I have both been involved, then my experience would
3  lead me to predict odds are I would also disagree in
4  this instance.
5  BY MR. USHIRODA:
6     Q. And that's not based upon anything in this
7  case, it is just based on prior experience with Jenny
8  Wells?
9     MR. LEVIN: Objection; asked and answered,
10 argumentative.
11    THE WITNESS: It is based on my knowledge that
12 Jenny Wells and I have very different concepts of what's
13 appropriate, of what the word "appropriate" means --
14 BY MR. USHIRODA:
15    Q. So what I am asking --
16    A. -- when applied to specific facts.
17    Q. Okay. So what I'm asking about, is this based
18 upon you are basing your disagreement with her testimony
19 -- strike that.
20    The basis of your disagreement with Dr. Wells'
21 testimony regarding the appropriateness of the Hoahana
22 program would be based upon your prior experiences with
23 Jenny Wells, where you have always disagreed on what is
24 deemed appropriate.
25    MR. LEVIN: Objection; asked and answered.

**Page 123**

1  BY MR. USHIRODA:
2     Q. Is that correct?
3     A. Yes.
4     MR. LEVIN: Objection; asked and answered,
5  argumentative.
6     Doctor, if you would just hold off just a
7  second on your answer.
8  BY MR. USHIRODA:
9     Q. Any other reasons for your disagreement?
10    MR. LEVIN: Objection; asked and answered,
11 relevance.
12    THE WITNESS: My basis for dis -- if I were to
13 disagree, my basis for doing that would be based on my
14 prior knowledge; that is, that she and I have very
15 different concepts of appropriate.
16    And if I may add, I find, in looking at my
17 report, Exhibit No. 3, that I did not review any of
18 Jenny Wells' testimony, so I -- this is really very
19 abstract to me.
20 BY MR. USHIRODA:
21    Q. Okay. You also conclude that (Reading):
22       Amber Nahale was denied faith
23       under 504 because her parents
24       were never given written notice
25       of the DOE's refusal to pay for

**Page 124**

1       the program.
2       Do you see that?
3     A. I do.
4     Q. And we've kind of gone over that at length,
5  correct?
6     A. Yes.
7     Q. You also conclude that (Reading):
8       Amber Nahale was denied faith
9       under 504 inasmuch, three, her
10      education was not designed to
11      meet her educational needs as
12      adequately as the needs of
13      nondisabled children -- of the
14      needs of the nondisabled, I meant.
15      Do you see that?
16    A. Yes.
17    MR. LEVIN: Objection; document speaks for
18 itself.
19 BY MR. USHIRODA:
20    Q. Okay. How was her education not designed to
21 meet the -- her educational needs as adequately as the
22 needs of a nondisabled?
23    A. The premise underlying this opinion is that an
24 education that is free is different in meaningful ways
25 from the education that is not free. For example, I

**Page 125**

1  believe that the parents in this case experienced great
2  emotional stress and duress and concern over their
3  ability to finance the education.
4     That kind of duress and concern would not have
5  been a factor in their interactions with the staff that
6  they were training, in their own efforts to learn how to
7  do discrete trial training, in their own efforts to
8  supervise the program, to collect the data, to do all
9  the things that they did, I believe that that would be
10 negatively impacted by this constant concern about how
11 they were to finance what they were doing and what they
12 believed their daughter needed.
13    And in that respect, it was less adequate than
14 it would have been had they, in that respect and other
15 respects -- that's just an example -- it was less
16 adequate than it would have been had it been free.
17    Q. What are the other aspects? Well, I need to
18 find out if it is going into your opinion, Doctor.
19    A. The parents' financial limitations in providing
20 this program very likely resulted in them cutting
21 corners on furniture, on books, on tapes, on videos, on
22 pencils and paper and all the reinforcers, all of the
23 expenditures that went into that program.
24    It seems to me quite likely they would have cut
25 corners that would not need to be cut if the education

A20466E
BARBARA BATEMAN, Ph.D., J.D. VOLUME 1  JUNE 7, 2008

Page 130

1  her education was not designed to meet her educational
2  needs as adequately as the needs of nondisabled are met?
3      A. The other three reasons than I have given here
4  are the only ones that I'm aware of at the present time.
5      Q. And lastly, you conclude that (Reading):
6         Amber Nahale was denied faith under
7         504 inasmuch as, four, Amber was
8         denied access to her education but
9         for the Herculean efforts of her
10        parents.
11     MR. LEVIN: Objection; document speaks for
12  itself.
13  BY MR. USHIRODA:
14     Q. Did I read that correctly?
15     MR. LEVIN: Same objection.
16     THE WITNESS: I believe so.
17  BY MR. USHIRODA:
18     Q. And you know, Doctor, I believe we discussed
19  the meaningful access issue in the paragraph above,
20  correct?
21     A. Yes, we did.
22     Q. Is there anything else you care to add to this
23  opinion?
24     A. No.
25     Q. Okay. So everything you've provided me with,

Page 131

1  in answer to my questions regarding the preceding
2  paragraph, constitute the basis for your opinion that
3  Amber was denied access to her education?
4      A. Yes.
5      MR. LEVIN: Objection; asked and answered.
6  BY MR. USHIRODA:
7      Q. Okay. And you describe the efforts of her
8  parents as Herculean?
9      MR. LEVIN: Objection; asked and answered.
10     THE WITNESS: That a question?
11  BY MR. USHIRODA:
12     Q. Yes.
13     A. Yes, I did.
14     Q. And that's an adjective, a descriptor you use
15  in other of your reports, correct?
16     MR. LEVIN: Objection.
17     THE WITNESS: I don't recall doing that.
18  BY MR. USHIRODA:
19     Q. And did you use the word "Herculean" to
20  describe the parents' efforts because they went over and
21  -- over and above what you would normally see parents
22  doing?
23     A. What I norm -- could you clear -- clarify the
24  context of "normally see parents doing"?
25     Q. You know what, let me rephrase the question.

Page 132

1  It may have been vague.
2      Q. Why did you describe their efforts as
3  "Herculean"?
4      MR. LEVIN: Objection; asked and answered.
5      THE WITNESS: Because of my belief that when
6  parents exhaust their resources, when parents take it
7  upon themselves to learn the skills that are involved in
8  applied behavior analysis, parents take it upon
9  themselves to obtain resources from a somewhat reluctant
10  community, and do the other many, many things that the
11  Nahales did, the strength that it takes to do that, and
12  to do it over the periods of years that they did it, is,
13  in my mind, great.
14      And to me, Herculean is a symbol of great
15  strengths above and beyond what's ordinarily shown. And
16  I think the Nahales did that very, very well.
17     Q. And Amber received her education, did she not?
18     A. In spite of DOE, she did.
19     Q. Okay. Doctor, why don't you turn to, I believe
20  Exhibit 4, which is your July 9th, 2003 report.
21     MR. USHIRODA: Off the record.
22     (Discussion off the record.)
23     (Recess.)
24  BY MR. USHIRODA:
25     Q. Okay. Doctor, you have in front of you what I

Page 133

1  have marked as Exhibit 4 to your deposition.
2      Is this your report dated July 9, 2003?
3      A. Yes.
4      Q. Okay. If you look at the first paragraph
5  again, your report lists a number of documents and
6  pleadings, as well as transcripts that you have reviewed
7  in preparing this report; is that not correct?
8      A. That is correct.
9      Q. Okay. And you list a number of deposition
10  transcripts. I take it these deposition transcripts
11  were among the records of yours that were destroyed
12  inadvertently?
13     A. Yes, that is correct.
14     Q. Do you see a deposition transcript for Jenny
15  Wells?
16     A. I do.
17     Q. Okay. But at this date, you are not able to
18  recollect the substance of her testimony?
19     A. It was more than seven years ago. And I do not
20  recollect her testimony. But I can predict what it was.
21     Q. Okay. Based on your prior experiences, right?
22     A. Right.
23     Q. Okay. Well, sometimes I have trouble
24  remembering what I had for breakfast, so seven years,
25  that is a while.

34 (Pages 130 to 133)

forth in this report, which I understand is by no means exhaustive, but at least the ones you found to be important, correct?
 A. Yes.
 Q. Okay. And from that, you were able to reach the conclusion you have just asked -- I mean which you've just given to me, correct?
 A. Correct.
 Q. Okay. What was it in these facts that told you that this -- these events could not happen other than by conscious, deliberate decision?
 MR. LEVIN: Objection; asked and answered, document speaks for itself.
 THE WITNESS: Based on my experience with literally thousands of parents of children who have disabilities, it is my belief that when parents are as active, involved, intelligent, educated as the Nahales are, had they been given appropriate notice of all the things that the government is required to give us notice about, there is no way that they would not have known that they were entitled to these programs.
 They would not have learned it from a chance encounter. They would have learned it from written notification from government agencies. That's one fact.
 The fact that the parents requested

Page 138

reimbursement no later an January '98 and perhaps three months before that and they did not receive it, they were denied it, and apparently without benefit of written notice or explanation.
 The fact that this happened -- this -- the need for funding came up again in yet another IEP meeting with a DOE rep, and again, the funding was never forthcoming. It is my believe that the -- the fact was found that Ida indicated that DOE could not pay, and that that was a verbal refusal of DOE -- of DOE.
 The car wash, I just can't even comment on again. And the unanswered letter that I now know went to DOH, as well as to DOE.
 Those facts are central, I believe, in my conclusion that these were conscious, deliberate decisions. They were not mere carelessness or what have you.
 Q. Or due to bureaucratic malaise?
 A. Thank you. Famous bureaucratic malaise. More, in my opinion, was involved here than bureaucratic malaise.
 Q. Okay.
 A. Although heaven knows there's a lot of that everywhere.
 Q. Well, that's for another time.

Page 139

 A. Yes.
 Q. Okay.
 A. I do know it can be powerful.
 Q. Any other -- any other factors come to your mind? I know you've given me quite a few -- you know, an exhaustive list.
 A. And I do refer in here, too, to the fact that in all of my experience dealing with this area of special ed, I don't think I have ever met a school person who didn't get it, the program has been to free. That is such a fundamental basic thing. I would expect the teachers out in your class, generally teachers in your classroom know that.
 And to be asked to believe that these folks, any or all of them, might not have understood it is just contrary to a lot of experience that I have. It is incomprehensible to me.
 Q. Would it change your opinion at all, Doctor, if you assume that the DOE was operating under the miss -- under the belief that the Autism Partnership Program was simply an additional program on top of what was being provided by Hoahana?
 MR. LEVIN: Objection --
BY MR. USHIRODA:
 Q. And if we assume that?

Page 140

 MR. LEVIN: Objection; relevance, assumes facts not in evidence, and improper hypothetical.
 THE WITNESS: That hypothetical seems to me so far removed from these facts that I hesitate to answer it lest it --
BY MR. USHIRODA:
 Q. Well, it is my --
 A. -- my answer be misunderstood.
 Q. It is my hypothetical. But if you could please answer it.
 MR. LEVIN: Same objections.
 THE WITNESS: If no one from DOE had any knowledge of a program being offered that was referred to, part of the IFSP and IEP -- no, that's not your hypothetical. Your hypothetical was --
 MR. USHIRODA: Would you like it read back?
 THE WITNESS: Yes.
 MR. USHIRODA: Could you please read my hypothetical back?
 (Record read as follows:
 "Question: Would it change your opinion at all, Doctor, if you assume that the DOE was operating under the miss -- under the belief that the Autism Partnership Program

Page 141

36 (Pages 138 to 141)