# *Joan M. Hawkinson*

### Special Education Consultation Inservice Administrative Leadership Services

August 25, 2008

Gregg M. Ushiroda
Watanabe, Ing
First Hawaiian Center
99 Bishop Street, 23rd Floor
Honolulu, Hawaii, 96813

RE:    Amber N.
DOB:   01/17/■■

Dear Mr. Ushiroda:

The purpose of this correspondence is to convey my findings and opinions in regards to Amber N. as to whether Amber was provided an education to meet her individual educational needs as adequately as the needs of students without disabilities are met as required under Section 504.

The focus of this correspondence is to address the education that was provided to Amber N. from the 1997/98 through the 1999/00 school years with respect to whether this education was provided in accordance with the standards for a free appropriate public education (FAPE) as defined in Section 504 of the Rehabilitation Act of 1973 (504). During this time Amber was served as a child with a disability under the Individuals with Disabilities Education Act (IDEA).

There is a significant difference between an educational program under 504 and IDEA. IDEA requires that the individual educational program (IEP) be designed to meet the unique education needs of the individual child beyond what is offered to nondisabled children so as to enable the child to have the opportunity to receive educational benefit. 504 requires reasonable accommodations that are designed to meet the disabled child's educational needs to the same degree or as adequately as the needs of nondisabled children are met without changing the intent or purpose of the regular education program/s.

Analysis and Conclusion

As mentioned above the standard under 504 references the thought that reasonable accommodations be provided to a child for the purposes of providing equal access to the regular education programs and those curriculums. This report is based on a ten and a half hour observation of Amber in the school, home and community environments on May 19, 2008. This analysis is also based on a review of case records and reports. The

Amber N.

August 25, 2008

records reviewed included evaluations, IEPs, depositions and due process transcripts and decisions.

Amber was initially served as a preschool age child identified as an infant or toddler with a disability under Part C of IDEA in June 1997 when she was two and half years old. An infant or toddler with a disability means an individual under age three who needs early intervention services because the individual is experiencing developmental delays in one or more of the following areas: cognitive development, physical development including vision and hearing, communication development, social or emotional development, adaptive development; or has a diagnosed physical or mental condition that has a high probability of resulting in a developmental delay. At age three she was served as a child with a disability under Part B of IDEA. FAPE begins with Part B of IDEA at age three. FAPE does not apply under Part C of the act for children under age three. Amber continued to be served as a child with a disability in need of special education under Part B of IDEA from age three through five years old as a preschool age child. Amber's first IEP under Part B of IDEA (for children age 3-21) was developed on January 13, 1998. She was four days shy of being three years old on this date. This was in the middle of the 1997/98 school year. The requirement is that the child must have an IEP in place when they turn age three. The record indicates this requirement was met. In the State of Hawaii during the time frame of the 1997/98, 1998/99 and 1999/00 school years she was two, three and four years old. She turned age five on January 17, 2000, half way through the 1999/00 school year. There was no regular education preschool program available for the general population of preschool age children during the 1997/98 school year (age two and three) and the 1998/99 school years (age three and four).  As a result Amber was not denied access to public school education that was designed to be comparable to that of nondisabled children, for public school education did not exist for children without disabilities in this age range.

The Hawaii Department of Education has a public school State established program beginning at the kindergarten level. In Hawaii the child must be five years old as of December 31 of that year in order to be eligible for Kindergarten. As a result a child born on January 17, 1995 would have to wait until the 2000/01 school year to enroll in kindergarten for on December 31, 2000 the child would be four years and eleven months old on that date. With a birth date of January 17, 1995 Amber would turn age five on January 17, 2000, seventeen days after the December 31st date required in Hawaii to be eligible to enter school as a kindergarten child for the 1999/00 school year. The IEP developed for Amber on January 13, 2000 would have been the first IEP applicable with respect to 504. However, due to Amber's birthday she was not eligible to enroll in kindergarten during the 1999/00 school year because she was not five years old as of December 31,1999. She was four years and eleven months on that date. It is important to note that the years of discussion in this matter are from 1997/98 school year, the 1998/99 school year and the 1999/00 school year. In none of the school years that are the subject of this matter is there any opportunity for a comparable public school education or any requirement for a comparable education as specified in 504, for public school education for children below the age of five as of December 31st of any school year does not exist in Hawaii.

Amber N.

August 25, 2008

Even though the school year of 2000/01 is outside of the school years that are the focus of this matter, Amber began her school career eligible as a five year old for kindergarten at the onset of the 2000/01 school year. This is the first year in which 504 would be applicable for Amber. The IEP with a meeting date of January 24, 2000 was conducted during the 1999/00 school year and serves as the IEP in place when she became eligible for kindergarten during the 2000/01 school year. That IEP has notations of addendums of 4/10/01 and 7/19/00 and 9/26/00. The present level of performance section of the IEP documents that there is a "home program, part of Mental Health services, includes consultation by DOE, DOH, and Autism Partnership, skills training to support school curriculum has been beneficial to progress." The IEP indicates that the child qualifies for extended school year services and reports that "Mental Health services need to be continued during all intercessions to include speech and all related services."

The commitment of services section of this IEP states that the child will receive special education preschool classes from 1/24/00 for 19 hours per week for the regular school year in the 1999/00 school year and 19.5 hours per week for extended school year services from 6/16/00 through 7/14/00. Speech therapy was to be provided for thirty minutes per day, daily for the duration of the IEP and also daily for the same amount of time during extended school year services. Mental Health services in the home were provided for 30 hours per week for the duration of the IEP and during extended school year service time frames from 6/9/00 through 8/1/00. Special education services for kindergarten started on 8/2/00 (2000/01 school year) for 17.5 hours per week and continued through the entire IEP up to 1/24/01 when a new IEP would be developed. At the start of this IEP which addressed special education kindergarten services, and when kindergarten services are available to all children in Hawaii, Amber was five years and seven months old.

The section of the January 24, 2000 IEP that addresses participation in the regular education program indicates that the child "will be in the special education preschool program daily. She will be integrated with regular education peers during recess, school events, and special kindergarten activities. For 2000/01 (Gr. K), FSC class daily with direct speech services. Integration with regular education peers in nonacademic areas as appropriate. Daily 1:1 support as selected by parents." The adaptations necessary for regular education participation section of the IEP states "encourage interaction and expressive communication with peers. Special education teacher/EA (interpreted to mean educational assistant) to accompany to regular education class activities. MHP (interpreted to mean mental health personnel) to support regular education kindergarten for the 00/01 school year. Close supervision and monitoring for safety purposes. Allow time for exploration and opportunity to practice. Give clear directions and reinforce compliance/ attention to activity."

The above detailed commitments of service for Amber under IDEA in the first year in which she became eligible for kindergarten and therefore eligible under 504 meet the requirements of comparability as required under 504. Services are provided that are aligned with those offered to nondisabled children. Services are provided for extended school year when there is an interruption in educational programming. Accommodations are provided to allow access to the regular curriculum. In addition the present level of performance section of this IEP indicated the child is making progress year to year and

Amber N.

August 25, 2008

is benefiting from her special education program. Finally, the 2000/01 IEP was never contested as being inappropriate or not providing FAPE for Amber under IDEA.

In summary the school years between the 1997/98, 1998/99 and the 1999/00 were school years in which a comparable public school education did not exist for this or any other child with a disability born on January 17, 1995 under 504 because public education services for nondisabled children below age five do not exist in Hawaii. Amber turned age five on January 17, 2000 during the 2000/01 school year. This IEP was never contested as not providing FAPE for Amber. This IEP meets the standard of FAPE for both IDEA and 504. 504 requires a design to meet the disabled child's educational needs to the same degree or as adequately as the needs of nondisabled children are met in regular education programs. Clearly, the uncontested IEP and as such would imply that this IEP met the standards of IDEA as well as 504.

Sincerely,

Joan M. Hawkinson

# S.P.E.C.I.A.L.S. LLC
## Special Education Consultation Inservice
## Administrative Leadership Services
### 23 Prestwick Drive
### Sheridan, Wyoming 82801
### Phone: 920-284-0573
### Email: SPECIALS@bresnan.net

July 7, 2004

Randall Y. Yamamoto
Watanabe, Ing, Kawashima & Komeiji
First Hawaiian Center
999 Bishop Street 23rd Floor
Honolulu, Hawaii 96813

Dear Mr. Yamamoto:

Enclosed please find a copy of my report for the Patricia N., et al., v. Paul LeMahieu, et al.

Thank you for the opportunity to provide an opinion on this matter.

Sincerely

Joan M. Hawkinson

JUL 1 2 2004

# Report

**Joan M. Hawkinson**
**July 6, 2004**

**S.P.E.C.I.A.L.S. LLC**
**Special Education Consultation Inservice**
**Administrative Leadership Services**
**23 Prestwick Drive**
**Sheridan, Wyoming 82801**
**Phone:  920-284-0573**
**Email: SPECIALS@bresnan.net**

# Table of Contents

**Preface**..................................................................**3**

**Documents Reviewed**.................................................**4**

**Opening Statement**.....................................................**6**

**Facts**.......................................................................**7**

**Factual Summary**
    **Issue I**
    **Opinions & Conclusions**.................................... **11**

**Factual Summary**
    **Issue II**
    **Opinions and Conclusions**.................................**16**

**Factual Summary**
    **Issue III**
    **Opinions and Conclusions**.................................**17**

**Summary and Conclusions**.........................................**26**

**Qualifications**.........................................................**28**

# Preface

**ISSUES UNDER CONSIDERATION:**

1) "Did the DOE provide, or fail to provide, Amber with a free and appropriate public education?"
   - Evaluations
   - Administrative Services
   - Support Services
   - Least Restrictive Environment

2) "Did the DOE discriminate against Amber N. due to her disability?"

3) "Was the DOE's conduct deliberately indifferent to the educational needs of Amber N., a child identified as a child with a disability?

# Documents Reviewed

1) IFSP June 16,1997
2) IEP January 13, 1998
3) IEP January 29, 1999
4) Condensed Transcript Amber N██████ vs DOE (HEARING) "VOL I" TAKEN 10-18-1999 Page 1 to Page 187
5) Condensed Transcript Amber N██████ vs DOE (HEARING) "VOL I" TAKEN 10-19-1999 Page 188 to Page 352
6) Condensed Transcript Amber N██████ vs DOE (HEARING) "VOL I" TAKEN 10-25-1999 Page 353 to Page 434
7) CHAPTER 36 HEARING OFFICER DECISION AND ORDER 02-02-2000
8) Condensed Transcript DEPOSITION OF MARGARET KOVEN TAKEN ON 04-06-2001 Page 1 to Page 75
9) Condensed Transcript DEPOSITION OF MARGARET KOVEN TAKEN ON 04-18-2001 Page 76 to Page 203
10) Condensed Transcript DEPOSITION OF MARGARET KOVEN TAKEN ON 04-19-2001 Page 204 to Page 308
11) Condensed Transcript DEPOSITION OF TERRY BEURETT TAKEN ON 03-14-2001 Page 1 to Page 109
12) Condensed Transcript 30(B) (6) DEPOSITION TAKEN ON 04-18-2001 Page 1 to Page 110
13) Condensed Transcript DEPOSITION OF BETH SCHIMMELFENNIG TAKEN ON 08-16-2000 Page 1 to Page 51
14) Condensed Transcript VIDEOTAPED DEPOSITION OF PHYLLIS IDA TAKEN ON 02-09-2001 Page 1 to Page 80
15) Condensed Transcript DEPOSITION OF ROBERT MARVIT M.D. TAKEN ON 04-17-2001 Page 1 to Page 64
16) DEPOSITION OF MARYANN QUIGLEY TAKEN ON 02-22-01
17) Condensed Transcript DEPOSITION OF ROBYN WESTLAKE TAKEN ON 02-22-01 Page 1 to Page 46
18) Condensed Transcript DEPOSITION OF TOM SMITH TAKEN ON 08-25-2000 Page 1 to Page 35
19) Condensed Transcript DEPOSITION OF JENNY WELLS TAKEN ON 04-19-2001 Page 1 to Page 87
20) DEPOSITION OF DEBRA FARMER TAKEN ON 08-27-2003
21) REPORT Barbara Batemen, Ph.D., J.D. 07-09-03
22) REPORT Douglas W. Houck, Ed.D. 11-15-2003
23) REPORT Bryna Siegel, Ph.D., 01-17-2001
24) DECLARATION OF BETH SCHIMMELINGINNG DATED January 17, 2001

25) ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE
FOR FUMMARY JUDGEMENT AND GRANTING IN PART AND
DENYING IN PART PLAINTIFF' <u>MOTION FOR SUMMARY
JUDGMENT</u> DAVID ALAN EZRA Filed in the United States District
Court, District of Hawaii May 29, 2001
26) Progress Notes November 1998 – May 1999

# Opening Statement

The purpose of this report is to provide an opinion relative to whether the Department of Education (DOE) for the state of Hawaii and it's agents or representatives in regards to the delivery of educational services to Amber N█████, a child identified with a disability under the Individuals with Disabilities Education Act (IDEA) failed to provide services as called for in IDEA and the child's IEPs of January 1998, April 1998, May 1998, November 1998 and January 1999. Were the services appropriate as called for in the law? Were the evaluations appropriate, administrative services, was placement in the least restrictive environment? Did the conduct of the DOE discriminate against Amber N█████ due to her disability to the extent that the failure rises to the level of deliberate indifference?

At issue in this matter is whether the DOE and its representatives and agents failed to provide a free and appropriate educational program (FAPE) to the child as called for in IDEA to the level that their actions in delivering services called for in the respective IEPs for the child not only did not meet the requirements of IDEA to constitute FAPE but that the failure or lack of effort or commitment to provide those services rises to the level of deliberate indifference and thereby reaches the threshold to grant consideration of punitive damages.

6

# FACTS

- Amber N̶o̶◼◼◼ (DOB 1/17/19◼◼) is a child diagnosed with autism at age two
  (4/10/◼) by Dr. Margaret Koven, Psy.D. from Kaiser Permanente
  Developmental Pediatrics Clinic. Her report referred the parents to the infant
  program, to the DOE for preschool and referred the parent to "Naomi Grossman
  at the Autism Project to initiate introduction to Discreet Trail Training (DTT)."

- Amber N̶◼◼◼ received services from the Department of Health (DOH) in
  (6/17/1997) through an Individual Family Services Plan (IFSP) under part C of
  IDEA with DOH the lead agency, which included a home program that included
  appropriate behavioral and language development training for a child with
  autism. Those services included DTT from Windward Family Guidance. One of
  the persons who provided those services was Kerina Oshiro.

- At some point shortly after the parents were made aware of the diagnosis of
  Autism and prior to September 29, 1997, Amber's parents became aware of the
  services of the California Based Autism Partnership Program under the direction
  by Dr. Ron Leaf and identified (9/29/97) that they desired reimbursement for the
  expenses they incurred for attendance at the Autism Partnership Workshop
  including air, hotel car rental and meals. This request was refused from DOH
  because appropriate services including discreet trial training (DTT), a
  cornerstone of the home services component could be provided by the local
  agency. The request was responded to by indicating that resources would be
  secured within the 0-3 program in Hawaii. This substantiated documentation on
  the part of the DOH to deny the parent's "want or need" but it is unclear that the
  parent recognized or considered this a denial.

- There is no record, evidence or report indicating that Amber's parents contested
  the DOH decision not to reimburse the expenses they had incurred for the Autism
  Partnership Workshop as indicated as a "want or need" on the ISFP. Regardless
  the parents proceeded to secure the services of the Autism Partnership Program
  prior to the first ISFP. They paid for these services directly.

- The parent continued to secure these services and in fact made the $500.00 down
  payment to the Autism Partnership Program before the first IFSP was developed
  by the DOH. The record indicates they made that payment sometime prior to
  9/29/97. Per the documents provided by the parent for requests for
  reimbursement by the Administrative Law Judge (ALJ) it is clear the parent kept
  receipts for expenses they incurred with the Autism Partnership Program. Based
  on that fact it is likely the parents did not accept the statement recorded on the
  9/29/97 IFSP document that services provided from Hoahana were designated as
  an appropriate alternative to the Autism Partnership Program. However there is

7

no record of the parents objecting to the apparent denial of their request for reimbursement until their letter of July 2, 1999.

- The first documented meeting with DOE staff was on 11/20/97; two months prior to age three, which discussed the transitioning of the child from the 0-3 program to the school, program CFR 300.121(3), (1), CFR 300.132.

- Amber became eligible for DOE services at age 3 under part B of IDEA. An IEP was developed for her on January 13, 1998, four days before she turned three years old CRR 300.121(3),(1),(i). The IEP dated 01/13/98 designated special education services that included an in home component that DOH was providing and a school component at Enchanted Lakes Elementary School as well as Speech Therapy and Occupational Therapy. The program was initiated on January 20, 1998, three days after her third birthday CFR 300.121(3), (1), (ii), 300.341-345. That IEP committed 20 hours a week of in home family guidance defined in the 11/20/97 report as "in home therapy" provided by Hoahana and Windward Family Guidance CFR 300.341.

- The record shows that on April 27, 1998 Dr. Koven completed an assessment of Amber, (CFR 300.321) and recommended that discreet trial trainers receive "on going support from someone familiar with DTT and TEACCH." On the basis of that report a mental health service plan was developed that included DTT, a system of measuring progress for Amber in this service, and on going consultation between the trainers and Dr. Koven. The mental health service plan was reviewed on April 3, 1998, July 7, 1998 and October 9, 1998. Comments were made in the July review that the four part time home trainers from Hoahana have "demonstrated outstanding skill in working with Amber." It is clear from the records that the Hoahana program was providing home DTT services. Testimony from the Due Process hearing from Kerina Oshio formally employed by DOH and serving the child from the first IFSP session and employed by DOE from August 1999 indicates she was directly involved in the development, direction and process of evidencing progress for the services provided by the therapeutic aides/skills trainers CFR 300.347, (7),(B). It is also clear from the records that the Hoahana program was provided at no cost to the parents however the parents evidentially continued to pay for the consultation they received from the Autism Partnership Program. It is also clear from the records that Dr. Koven of DOH provided consultation to the home training team. In her report of January 9, 1999 Dr. Koven stated, "the family and team have consulted with me and the Ron Leaf Trainers and have developed the plan."

- The Enchanted Lakes Elementary Program for Preschool children ended for Amber as per request from the parent and recommendation from Dr. Koven dated 4/3/98. This was substantiated in notation in the conference review and notes section of the 1/13/98 IEP dated April 3 1998, CFR 300.350, 361. The team decided to move Amber's total program to a home based service model.

- A record from Terry Beuret Ph.D., from Hoahana, the designated psychologist assigned to develop curriculum, and set up the home training services called for in the IEP stated in a document dated 5/11/98 that she advised and directs the staff to develop drills and collect materials relative to her special education program that included DTT training CFR 300.350, (2).

- Amber returned to part day school services and part day home training services for the 1998 summer school/ESY services designated on the 01/13/1998 IEP.

- An IEP was held on January 29, 1999, CFR 300.346 that stated in the present level of performance the following: "Skills training/home therapy program supportive to school curriculum…ongoing support with Autism Partnership beneficial to learning and home/school program. Consultation/training ongoing by Autism Partnership greatly contributes to progress. Team agrees to need and *programs* (emphasis added by author) in home and school." The commitment of services in this IEP states as follows: "Special education in school, 19 hrs/wk during regular school year and 20 hrs/wk during ESY, Speech therapy 60 minutes/wk during regular school year and 30 min/wk during ESY, Mental Health Services in home 20 hrs/wk during regular school year and ESY. Occupational Therapy services 30 min/mo. during normal school year and ESY." CFR 300.361

- The IEP held on January 29, 1999, CFR 300.346. In the "Conference Information and Notes" section of this IEP review is the following: "Discussed need to secure funding for in-service/training and consultation for parents and teachers. Tom Smith will work with parents to get funding and recovery for costs of Autism partnership training/consultation. Plan for quarterly team meetings with school & home therapists. Refer to treatment plan for Hoahana (Mental Health)."

- On July 2, 1999 the parents sent a letter to Bruce Anderson of the Department of Health with copies to numerous individuals including DOE officials that they were requesting reimbursement for expenses. Specifically payment of costs they incurred for the services they requested for the Autism Partnership Program.

- On August 27, 1999 the parents requested a due process hearing. Their request pertained to the Department of Education failing to reimburse the parents for costs of consultations, supplies, equipment, workshops and requested payment of $17,265.97. In addition the parents requested continuing reimbursement of $600.00 per month for future projected expenses.

9

- A hearing was held on October 18, 19 and 25, 1999 the decision issued on February 2, 2000.  The order stated the following:
  - ➤ Petitioner and Respondent shall promptly convene an IEP meeting. The DOE is to submit a program and service to provide FAPE to the student. Specifically, the IEP shall determine whether Autism Partnership and its associated costs will continue to be part of the student's home program.
  - ➤ Respondent shall reimburse Petitioner a total of $13771.88. This amount covers all reimbursable expenses up to July 1, 1999.

- The DOE did not contest the hearing officers ruling.

- Parents have brought suit in federal court claiming the DOE acted with deliberate indifference with regard to the provision of FAPE and are therefore entitled to sue for damages.

# Factual Summary

**Issue I:**   "Did the DOE provide, or fail to provide, Amber with a free and appropriate public education?"

- Evaluations
- Administrative Services
- Support Services
- Least Restrictive Environment

**Opinions and Conclusions,**

⇒ The DOE conducted evaluations of the child per the requirements of IDEA under CFR 300.320 and 321. The evaluations were timely, had the required participants as per 300.344, involved the parent as per 300.345, and provided the staff to complete the assessments with the qualifications under 300.136. The determination of eligibility for a child with a disability was consistent with the requirements of 300.7(2), (i) under the definition of Autism and requirements of 300.534 and 535, (determination of eligibility.) The evaluations were conducted per 300.530 through 300.453. A written report was developed per 300.543. In conclusion the DOE met all requirements for evaluations and reevaluations per the applicable federal regulations.

⇒ The DOE was required to provide transition services per 300.132 (Transition of children from Part C to Part B Preschool Programs) and did that with reference to meeting the timelines of that regulation.

⇒ The requirement of Imps per 300.340 through 300.347 are extensive and often are the focus of due process issues. The requirements of 300.342 relative to when IEPs need to be in effect were met by the DOE. The child was evaluated, determined eligible and provided an IEP with placement notice prior to age 3 per this regulation and 300.132. The teams were constituted with appropriate people as called for in 300.344. Timelines called for in 300.343 were adhered to. Parent participation was secured as per 300.345. The requirements of 300.346 relative to development, review and revision were generally followed. The only exception was that the author could not find documentation through the IEP form format to show that Amber's services were changed in April 1998 from a commitment of a part day school program to a full day home program.  There was documentation of this

11

process except outside the IEP form format.  In this instance, in the author's view the requirements of 300.346 were not adhered to. The requirements of regulations under 300.347 relative to the content of the IEP was responded to appropriately. The present levels of performance were based on latest assessments and progress notes, the goals and objectives were measurable for the most part CFR 300.347. Statements were made relative to the commitment of special education services, related and supplementary services consistent with 300.347 (a), (3). Explanations were provided relative to participation with non-disabled peers consistent with 300.347 (a), (4). The statements of LRE per 300.550 were articulated with respect to justification for removal from the regular education setting.

### Discussion and Perspective

Given that the DOE generally met the requirements of the regulations that took place with respect to this case what brings this matter to the present state of precedent setting litigation? The author will attempt to address this in the context of whether there were some omissions or lack of clarification in fulfilling the requirements of the regulations and whether the fulfillment of some regulations over emphasized certain components.

❖ The CFR 300.345 requires parent involvement, participation and program direction. This regulation under IDEA generally speaks to being notified of the meeting, being invited to attend at dates and times that are reasonable, be informed about the purpose of the meeting, and if the child is age 16 that the school will invite the student if they are going to talk about transition to post school life. The regulation goes on to indicate that the school must tell the parent who will be attending and if the parents can't attend what steps the school must take to secure their input. It states that schools must obtain an interpreter if the parent is deaf or does not speak English. It says that parents are to receive copies of the reports and IEPs at no cost to them.

This regulation does not require schools to make the parent a "super" participant or member with authority or responsibility or rights over and above any other official. The regulation does not give the parent veto rights over the IEP or enable the parent to supersede their views over those of other IEP participants. The regulation does not require the school to consider parent input to supercede the views of any other IEP participant. However, in this case the parents clearly involved themselves in the determination of service arrangements prior to the child turning age three, and even prior to the DOH establishing the first IFSP plan for the child in June of 1997. They had already secured a service provider and spent money with the Autism Partnership Program before the ISFP team determined appropriate services and began to provide those services.

❖ When the DOH first initiated their service plans the parents were already asking for reimbursement of costs. When the DOH initiated their services they found a parent who already was in the pattern of establishing service goals, evidently

consulting with the Autism Partnership Program, appearing to have knowledge and expertise, demonstrating a desire to be actively involved and committed and even buying supplies. The IFSP process in part C of IDEA which was a DOH responsibility at that time requires "Parent Participation" just as it does in part B which is a public school responsibility after age three. However, the requirements for the ISFP allow for greater parent discretion then it does in IDEA. From the very beginning the DOH in establishing the home DTT program found a parent who was very definitive in knowing just what they wanted to accomplish and seemingly willing to work with the staff to get those things done. From adhering to the regulation for the parent participation in the IFSP process this is appropriate. At that age of the child FAPE as a concept and responsibility for DOH does not exist at the same level as it does for schools when the child turns age three. When the parents asked for reimbursement from DOH in September of 1997, still before age three and before DOE was involved with the family, the comment in response to the parent that services from 0-3 Hoahana will provided apparently was not explicit enough and therefore perhaps not considered by the parent as a refusal for the desired reimbursement of services from the Autism Partnership Program. In hind sight the team should have clearly documented that the parents desire to be reimbursed for the expenses from the Autism Partnership Program would not be an expense that the DOH needed to reimburse due to the fact that appropriate services were identified and designated through Hoahana. If the team believed the Nahale's were entitled to reimbursement for their costs there is no record of such. One could assume from the record that the team considered and rejected the "want or need" given the commitment of service arrangements that were designated on the ISFP in lieu of the Autism Partnership Project. There is evidence that they did involve the parent as part of the parent participation requirement process and used the suggestions that they provided.

❖ Upon the transfer of the case from the DOH to DOE they apparently continued to use the service model already in place for the home training services established by DOH. On the service delivery side this seems logical. This ensures continuity of service, consistency for staff and the child and maintains relationships. The DOE committed the services for home training as part of the IEP and maintained the same service providers. The parent involvement component requirement was now an IDEA requirement. Now the regulations of 300.345 are in effect. The difference is that FAPE is a school system responsibility and FAPE is to the child not the parent. Therefore the extent of parent direction and involvement in the home component should have been a signal that perhaps this should be addressed. Clearly the team seemed to follow the IFSP model of parent participation and not the IDEA requirements. The records and depositions conflict as to the extent that the parent was "responsible" for the home component of the IEP. Clearly the services provided by Hoahana were at no cost to the parent as per the requirements of the law. Clearly the parent, and perhaps one or more of the home trainers felt the parent was "in charge" of directing the home component. Early in 1998 or at the latest in April when the child went to full day home services an IEP meeting should have been called to address the degree of active or passive

13

involvement of the Autism Partnership Program as per the providers that were responsible for delivering the in home services. At issue was the determination of whether that involvement was essential for the delivery of home services as called for in the IEP? If it was then a determination of the degree of commitment of those resources needed to be addressed on the IEP and stated as such. If it was not, and if the training and supervision of the staff that carried out the home services component from Hoahana was appropriate to address the needs identified in the IEP than that should have been stated. In any case the parent could access their options to secure an independent evaluation if they wished or request a due process hearing to determine the appropriateness of the services provided by Hoahana.

The commitment of services section of the January 13, 1998 IEP only addressed services through Windward Family Guidance (Hoahana). There was no documentation, no mention at all of the involvement by the parents with the Autism Partnership Program and their apparent desires to have that program provide the home component of the designated services in the home environment. The review of the documents and subsequent testimony and depositions indicate that at the time of the January 13, 1998 IEP meeting some of the participants were aware that the family had been receiving services through the Autism Partnership Program. A possible omission occurred in that the IEP team failed to clarify with the parents their involvement with the Autism Partnership Program and discuss the distinction between the Autism Partnership Program services they were receiving and the services that were designated on the IEP and whether or not all or any part of the Autism Partnership Program services were needed to ensure FAPE.

The first official notice of the Autism Partnership Program in the IEP was by involvement of Windward Family Guidance staff at the January 29, 1999 IEP meeting that included a comment in the conference notes section that Tom Smith will attempt to help find funding for the parents efforts. This was the first real opportunity for the IEP team to address this issue and perhaps was the first documented possible error of omission.

It is the responsibility of the school district under IDEA to implement the IEP at no cost to the parent. The school system can do that in a variety of ways including doing it directly through the employment of their own staff, doing it in conjunction with another school district, providing the service through another public agency or providing the service through a private contract. The stipulation in IDEA is that the services must meet the commitments established in the IEP and be at no cost to the parent. As long as the services meet the IEP commitments and is provided at no cost to the parent FAPE is assured. The DOE provided the home training services to the child through the DOH structure as the vehicle to meet the service commitments of the IEP. The parent evidently didn't mind those services as long as the consultation they received from the Autism Partnership Program continued. No documentation of discussion as evidenced in testimony,

14

depositions or conference notes indicated that the parent had provided input at the first IEP meeting that prior to the onset of that meeting they had secured consultation services through the Autism Partnership Program, maintained a record of receipts and wanted the IEP team to consider the Autism Partnership Program as a option of service provision to provide FAPE. The first documented record of the Autism Partnership Program contributing to the service arrangements was found in the Present Level of Performance Statement in the January 29, 1999 IEP, a year after Amber's initial IEP was developed. That IEP did not designate the Autism Partnership Program as a commitment of services necessary for the provision of FAPE. Depositions from IEP participants at the January 29, 1999 IEP meeting did not provide testimony to the effect that these statements or discussions regarding these statements warranted the IEP team to consider the Autism Partnership Program was a necessary part of FAPE and needed to be designated as a commitment of service on the IEP.

15

# Factual Summary

**Issue II:** "Did the DOE discriminate against Amber N. due to her disability?"

### Opinions and Conclusions:

The issue of whether or not the DOE discriminated against Amber due to her disability is primarily based on 504 regulations. In a very real sense courts as well as the Office of Civil Rights (OCR), the agency charged with regulation of this law have determined that if a school system meets the regulations of IDEA for a child with a disability then they have satisfied the requirements of 504 in terms of referral, identification, evaluation, programming and service provisions as well as parent participation and notification of rights. Given the authors views that DOE generally met the requirements of IDEA the DOE did not discriminate against Amber based on her disability.

### Discussion and Perspective

In a very real sense the courts will decide if the DOE discriminated against Amber based on whether the court determines if the DOE acted in a way as to be determined that those actions met the standard for deliberate indifference. If that is determined then the DOE could be judged to have discriminated against Amber. This discussion will be addressed in section III of this report.

16

# Factual Summary

**Issue III:**  Was the DOE's conduct deliberately indifferent to the educational needs of
Amber N., a child identified as a child with a disability?

## Opinions and Conclusions

In review of this issue it is of benefit to review the events that took place between June of
1997 and August of 1999, the players that were involved in undertaking activities during
this time frame, the roles they played or were expected to play, what they reported or
documented at particular times during these time frames and in some cases comparing
their testimony during depositions to what they recorded or stated during the timeframe
in question.

⇒ Terry Beuret is a certified psychologist. Her deposition of 3/14/01 provided
considerable insight into the actual performance of the duties of staff assigned to
address the IEP commitments detailed in Amber's IEP. During 1997 she was a
contracted agent by the state working for Hoahana. As of November 97 she was
employed by the Department of Health and assigned to the 0-3 early intervention
project. As such she stated in her deposition that her role as the family
psychologist would be a therapist that wrote the program, developed and set up
the curriculum, behavioral interventions, arranged for, scheduled, provided
supervision of the therapeutic aides and coordinated the services with the family.
She attended the 11/20/97 meeting at the Nahale home to discuss transition
services from 0-3 to the school program operated by DOE. While her name does
not appear on the meeting record so one could wonder if she was present her
deposition clearly indicates she was present. Her role at that meeting was to help
represent DOH in facilitating the transition. Her deposition of 3/14/01, states that
she was a psychologist and had experience with other home programs. The
arrangements between DOE and DOH, as part of the FELIX consent decree in
place was that DOH would contract with service providers (Hoahana) to deliver
appropriate in home special education mental health services to meet the
commitments of the IEP. When asked during her deposition in March of 2001
whether she actually set up the curriculum as per her understanding of her
assignment her answer was "I didn't need to do that because it was already being
accomplished"…"They (the parents) were doing the program writing, the actual
nitty-gritty, what the trainers would actually do"(page 11,deposition 3/14/01)…"I
think it was going on before that, the family was getting volunteers and they were
already writing, doing, you know, contacting and organization before the
IEP."(1/13/98)(Page 16 deposition 3/14/01)…So I stepped down from being a
therapist to doing just case management, "then authorized myself to be case
manager." (pages 41-42, deposition 3/14/01, emphasis added by author). When

17

asked in her deposition if she ever told the parents of why she was there she said, "probably did, but I guess not clear enough. And at that time they probably would have said, well, we don't need your services, we don't need you to do this," (develop curriculum, write program and give supervision and direction to therapeutic aides), "but we need you to do this," (case management), (page 43 deposition 3/14/01). Her deposition further states in response to a question about her stepping down from the psychologist,

"Q. And you spoke to the N█████ and you said, basically, you guys are doing fine, I want to step down to be Case Manager?

A. That my role is more-It's more like a manager, managerial type work.

Q. Now at this point, had you attended any IEPs before that point or up to that point? When you were going to-when you stepped down as case manager, had you attended any IEP meetings before that?

A. Before that yes.

Q. And at those IEP meetings, had you explained to the team essentially that you weren't really performing the duties of a psychologist, developing curriculum and everything else, but had a kind of new kind of- different kind of responsibility that would normally be expected of a psychologist.

A. No, I didn't.

Q. So the team wasn't aware of that. Do you remember whether or not Mr. or Mrs. N█████ informing the team, were not using Terry-Dr. Beuret in the manner you might have originally thought she was being used, we're using her for something else.

A. Witness shakes head.

Q. No? You have to say yes or no to the court reporter.

A. As far as I know, no.

Q. Did they ever inform the IEP team that, you know, we're rather happy with Autism Partnership and their development of the curriculum and training the trainers and Dr Beuret really isn't necessary for the curriculum, or we want the IEP team to pay for Autism Partnership because, hey you know, if it ain't broken, you know, just continue with it, just pay for it, anything like that?

A. No, they should have. No I don't remember that.

Q. Now when you stepped down, who did you-after speaking to the N█████, did they voice any concerns like they wanted to get more out of you than just case manager, like they wanted to you coordinate with you Autism Partnership or anything like that?

A. No, nothing really changed that much. I stopped attempting to be more of a psychologist and just resigned myself to being a case manager. It was an interesting case and I was learning a lot, so that's how I saw it.

Q. Now Autism Partnership, did you have any discussions with them saying that the state should be paying for Autism Partnership at the time when you stepped down?

A. No.  (Page 46, 47, 48 deposition 3/14/01)

Q. So you sign in as the family psychologist, and then the first time that you signed in as-to your knowledge, the first time you signed in as a case manager was on 1/29/99?

A. Uh-huh.
Q. Is that a yes?
A. Right.
Q. At that time did you inform the IEP team, since this is the first time after you stepped down to be a case manager, that your new function was now as a case manager?
A. No," (page 50, deposition 3/14/01).

Records attached to her deposition indicated that Mrs. Beuret sent to her superiors and other IEP members information that one could assume were completed in the capacity as a psychologist. Documents referred to setting up treatment plans, establishing monitoring systems, establishing a home routine to be followed by the parents. When she informed her supervisor of her decision that she stepped down she indicated in her deposition of 3/14/01 on page 49 that they were perfectly happy with her continuing on with authorization of being a family psychologist and indicated that they, "may have felt uncomfortable with not a psychologist from-supervising it: however it really never became an issue." One can surmise that the supervisor never understood the role distinction as interpreted by Dr. Beuret that this implied and that there was not agreement with her desire to reclassify her position as anything other than the "family psychologist". The deposition goes on to state that her supervisor wanted her to continue as a psychologist.

⇒ The testimony of Debra Farmer, Administrator of Special Education for DOE through her deposition of 4/18/01 and 8/27/03 provides insight into the relationship between DOE and DOH relative to the provision of early intervention services for Autistic children under IDEA for the state of Hawaii as existed during the timeframe of this matter. These relationships were established in part as a systemic response to FELIX issues resulting from another court determination.

Ms. Farmer reports that DOE and DOH were "joined at the hip...they were responsible for us and we were responsible for them." She reported the consent decree from FELIX ordered this arrangement to serve the needs of children with disabilities in the state of Hawaii. The application of this process meant that DOE "contracted" with DOH to provide related services for all disabled children. These services included social work, psychology, occupational therapy, physical therapy, and training and curriculum direction and direct service responsibility for children needing early intervention, particularly for children needing DTT. DOH staff would be part of IEP team meetings under the FELIX consent decree and be responsible for implementation of the services detailed in the IEP. DOE would be responsible for teachers, teacher aides and evidentially the structure of the IEP process and forms as well as ensuring that staff were appropriately certified or trained as per CFR 300.136 for which the staff DOE was responsible. Similarly DOH was responsible for training the staff for which they were responsible. Per the deposition of Ms. Farber on 4/18/04, prior to the consent decree DOE

19

contracted with outside agencies for particular related service staff and was responsible for meeting the requirements of CFR 300.136 directly.

⇒ Christina Donkervoet, Chief of the Child Adolescent Mental Health Division of DOE provided a deposition on 4/18/2001. Her testimony was intended to provide clarification of what the service arrangements were during 1997-1999 between DOH and DOE relative to services for Autistic children in Hawaii. She commented that DOE also contracted with some consultants for autism services directly. She commented that from her view, the costs of curriculum and materials for implementing these types of programs, was a DOE responsibility, generally. She also commented that these same services could also be paid out of DOH funds set aside for these purposes. One could conclude that both DOH and DOE helped fund some of these services and there was no set standard for determining how this was arranged. She clarified that there were not contracts between DOE and DOH. Both agencies got funding directly from the legislature to meet their respective obligations.

Ms. Donkervoet was not familiar with the details of the case but testified on the general workings of DOE and DOH as it related to serving children under the FELIX consent decree and specifically with respect to services for preschool and primary aged autistic children. She was given a copy of the IEPs for Amber and asked to comment on them.
   "Q. And Amber still fell through the cracks?
   A. Based upon the documents that you're showing me, I don't think Amber fell through the cracks. Amber looks like she was getting a lot of services, and those IEPs actually look fairly strong of the goals and objectives that they were going on. What looks to me like happened is some discrepancy within the team about what the parents entered into before the IEP-that contract: that created some confusion: and that the care coordinator hasn't been strong enough. But the services per se actually seem pretty strong", (page 103, deposition 4/18/01). This rather short review from an official not directly aware of the case, asked to quickly review a few records of this case seemed to have, in the authors view profoundly summarized the circumstances in this case. She was not asked to testify at the due process hearing held in October 1999.

⇒ The testimony through deposition of Phyllis Ida of 2/9/01 from DOE speaks to issue of the assumptions and perceptions of service arrangements provided by DOE and DOH to address the needs of Amber as specified in the IEPs during the timeframe in question.

Her testimony spoke to when DOE learned of the parents' involvement with the Autism Partnership Program and the understanding of services that were being delivered to the child through DOH at the time prior to July 1999.
   "Q. What was your understanding the relationship between the N███████ and the Autism Partnership was?

20

A. Is that the program was-they had someone coming as consultants to the home. A. And that she-when she had told me about it, I guess, she talked to me about DOE paying for it, but she already had a program that Dr. Beuret and Dr. Koven had created within the home, so-

Q. You assumed that right?

A. Yes.

Q. You assumed that they had a program that Dr. Bueret and Dr. Koven set up?

A. No. I didn't assume it. They had me visit the program. They showed me the program. Maggie Koven actually bragged about how wonderful the program was- I was very impressed because it was all set up", (page 23, 24, deposition 2/9/01).

She goes on to say on pages 49-52 of her testimony that as far as she knew everything that Amber needed for her services was provided from DOE and DOH. When asked to pay for the Autism Partnership her perspective was that this was supplemental.

"A. Yeah, but that's supplemental. She asked me for that as supplemental, like extra. She wanted that. Parents wanted that and they understood that it was supplemental to the program they were already getting, and the mom knew that. It was costing them a lot and I felt bad for them so I suggested, well, bring it up at an IEP meeting because if the team felt that that was necessary for the program, then they could put it in the IEP but the team felt that it was not necessary and that was-that was supplemental. Even the teacher told me that." When asked if the parents knew the services were supplemental she answered "She understood it was because she was getting Maggie Koven and Dr. Bueret. She was getting consultation from even Milani Plummer and if need be, you know-I don't know, she was having-I don't know. She was having all these other doctors, so it was like supplemental because, you know, it's like when you want private school instead of public school, you do whatever you want. It's like they wanted what ever was best for Amber and so they would go out and get extra stuff."

Her testimony goes on to state that after she found out that the parent was paying for these things, (February 1999), she told the mother that she could borrow furniture if she wanted, use the DOE copy machines, toys supplies, games. From the DOE perspective all the services that was necessary for meeting the IEP requirements was being provided from the arrangements in place and delivered from DOH.

⇒ A further review of the child's progress in the IEP documents as well as progress reviews by the Hoahana services providers offers definitive information and insight as to whether the child benefited from the program offering detailed in the IEPs between 1998 and 1999. One could assume that if the IEPs were constituted to infer benefit as per the standard set forth in Rowley that this would shed some light on whether the DOE acted with deliberate indifference. Clearly the argument could be made that the claim for deliberate indifference could be advanced if no progress was made. Review of the IEPs of 1/13/98 and 1/29/99 indicates the

following. There were 98 objectives in these IEPs. The statements of end of year progress records indicates 67 objectives were evidencing progress 30 were mastered and only one was rated as no progress. Review of progress records from Hoahana staff concerning the home DTT services indicates that between January to May 1999 a similar pattern of success and progress. The daily notes of the Hoahana staff support the progress reported on the IEPs. Clearly Amber was benefiting from the program offering.

### Discussion and Perspective

Central to this matter is whether the school district provided services to the child that was consistent with the IEP. If they didn't do that, if they ignored the service requirements, failed to hold regular annual IEP meetings, performed their duties in total disregard of their responsibility under the law one could argue that they acted in a deliberate indifferent manner. Deliberate indifference has been defined as, "the conscious or reckless disregard of the consequences of one's acts or omissions."

Review of the above material leads one to the following conclusions:

❖ It is clear the parents invested their energy to work with the Autism Partnership Program as their preferred consultant as is evident through parent testimony at the due process hearing. They took it upon themselves to try to have this service provision drive the program. First it is clear the parents secured, at their choosing and initiative the services of Autism Partnership Program soon after they learned of the Autism diagnosis. The testimony of the mother at the due process hearing indicates such action. That is also supported by depositions by Mr. Tom Smith. The mother's testimony stated that she had no confidence that anyone in Hawaii was equipped to address the needs of Amber and the family took it upon themselves to secure Autism Partnership services even before the DOH arranged the first service plan in 1997. Depositions from Mr. Smith and Robyn Westlake indicate the parents received direction on how to secure these services from modeling the strategies of another parent referred to in the depositions as "Mrs. C" who reportedly won a due process hearing with DOE that enabled that parent to secure Autism Partnership services at the expense of the state. The expectation of the parent from the very first IFSP sessions was to secure funding for the Autism Partnership program, (9/29/97 IFSP notation "reimbursement for the cost of Dr. Leaf's Autism Partnership") This same document notes that services would be provided by the 0-3 resources in Hawaii. This notation or the obvious delivery of DTT home trainers from Hoahana did not result in the parent accepting that the state had allocated an appropriate service to meet their daughter's needs.

❖ Equally evident is that the actual service providers took it upon themselves to co-mingle their efforts as a team, evidently under the direction of the parent through the "parent participation" component as stipulated in the regulations of the IFSP

and IDEA. While working as a team is a commendable undertaking in terms of working together in the child's best interest this process does not clarify which agency is the lead agency and what service is addressing the commitment of services called for under the IEP. The choice very early on by one of the key DOH staff to demote her and not inform anyone until long after the fact was a momentous event. Given the parent's evident desire to dismiss the DOH and DOE service offerings from the beginning as being secondary to their desire for the Autism Partnership Program the stage was set for the conflict that unfolded. The statements by officials from Windward Guidance at an IEP meeting suggesting that officials would attempt to secure resources to help pay for the parents expenses in reference to maintaining and supporting their choice of service providers did little to clarify responsibility. Instead this statement seems to be the focus of justification for linking the DOE to payment of these costs. Further this statement seems to be the trigger for making the claim that since the state did not pay these costs from the very first day the parent requested payment on 9/29/97 at an IFSP meeting **not** an IEP meeting that the DOE was deliberately indifferent regardless of the fact that home training services were provided to the parent at no cost to the parent from the very first IEP meeting.

❖ The DOE documented all services provided in the IEP, had in place service providers that were responsible for carrying out those services and those services were at no cost to the parent. FAPE is to the child not the parent. The issue to have been joined was to certify, through a due process hearing if necessary whether the home DTT services provided to Amber through Hoahana under the arrangements provided through DOE, DOH and Mental Health met the commitments of the IEP. In the author's view, this issue should have been joined through an IEP meeting shortly after February 1999. While Phyllis Ida suggested the parent call such an IEP meeting in a conversation with the parent the responsibility was the school system. The parent letter of July 2, 1999 should have been the second alarm that this issue needed to be joined through an IEP meeting. Within eight weeks of this letter the parents requested a due process hearing and successfully prevented the hearing from being one about the merits of the services provided to one that focused on their desire for financial reimbursement.

❖ Clearly the school district provided a program that was at no cost to the parent. They provided that service through arrangements with DOH and mental health. The DOH or Mental health service was at no cost to the parent and met the conditions of the IEP. Using DOH or mental health to provide this service is not a violation of IDEA and is not an indication of deliberate indifference. The parent didn't object to what the DOH, DOE or Mental Health had to offer, they wanted payment for their chosen program and what they themselves had provided. Given the facts it is hard to determine that the school acted with deliberate indifference in terms of not providing services called for in the IEP. The error was not deliberate indifference but failure to bring a distinction as to what was the service

23

provision of the IEP and whether the commitment of services designated on the IEP constituted FAPE that clearly identify the DOH and Mental Health service as addressing the IEP needs of this student.

❖ The hearing held in October 1999 offers some insight into this case. The due process procedure is by nature an adversarial endeavor. The premise is that both sides present their case with appropriate and competent counsel and allow the hearing officer to rule on the merits of the case presented. FAPE is in part assured on the basis that the hearing officer is able to rule on the effective presentation of the facts of the case. The parent's counsel during the due process hearing masterfully avoided the issue of whether the services provided by Hoahana, through DOH as called for in the FELIX consent decree was appropriate or not from being the focus of discussion. The parent's counsel successfully maneuvered the hearing officer to take the position that if the IEP said anything about the services provided by Autism Partnership Program that this meant the school system was acknowledging ownership of the Autism Partnership Program. Since the parent accepted the notion that the Autism Partnership Program was appropriate and since the Autism Partnership Program was referred to in the IEP therefore the IEP was appropriate and the parent's case depended on the acceptance by the hearing officer to the stipulation that the appropriateness of the IEP was not at issue. As a result the DOE was maneuvered from having the services provided by DOH and Mental Health as being the focus of the hearing relative to whether these services met the commitments required in the IEP. The parent's case hinged on having the hearing officer commit to this position, for once that position was accepted by the hearing officer the case was no longer a discussion of the IDEA requirement to provide services of reasonable benefit as determined through Rowley, 458 U.S. at 189. Now the focus was on a standard of where the parent sought to maximize potential which is clearly not the standard of IDEA.

The DOE was represented by a special education administrator in the due process hearing, not an attorney skilled at cross examination, preparing witnesses, organizing records, getting depositions and most importantly knowing how and when to object and present their case. Predictably the DOE lost their case and in a very real sense never had the opportunity to present it. The DOE in the presentation of their case, as the phrase in the movie goes, "brought a knife to a gun fight."

❖ The parents never rejected the designation of the in home program specified on the IEP 1-13-98 as <u>Windward Family Guidance</u>. No documentation was provided in meeting notes or on that IEP indicating that the team discussed consideration of the Autism Partnership Program as the entity that needed to provide the in home designated services. The same is true in regards to the 1-29-99 IEP. That IEP committed and designated services for the in home program as <u>Mental Health Services.</u> While there was notation in the IEP under the Present Level of Performance and in the Conference Note sections that mentioned the Autism

24

Partnership Program there is no evidence in testimony during the administrative hearing or in the depositions after the administrative hearing that point to the IEP team's knowledge of the extent to which the Autism Partnership Program was specifically contributing or providing services that the DOE had clearly thought the DOH were delivering. There is no record that the parents were forthright to anyone about their intent to have the Autism Partnership Program be determined to be the entity that was responsible for delivering the services that provided FAPE. Reference: (Christina Donkervoet, Chief of the Child Adolescent Mental Health Division, Deposition 4-18-01 pages, 75-76)

❖ The DOE and DOH did not have a procedural communication system of checks and balances that ensured what the DOE intended to provide as a commitment of service in the IEP was delivered and ensured FAPE to Amber.

❖ Culpability was due to lack of communication between DOE and DOH and lack of forthright communication by the parents from 11-20-97 through 7-2-99 as to what they were providing (paying for) and that they clearly intended to receive reimbursement from the DOE. The parent created a situation, and was perhaps inadvertently aided by an employee who was responsible for the delivery of the in home services who acted on her own, that enabled them to construct a case on their behalf to maximize the services Amber is entitled to under IDEA, and establish a position that anything short of the Autism Partnership Program was not adequate for their daughter.

# Summary and Conclusions

1) "Did the DOE provide, or fail to provide, Amber with a free and appropriate public education?"

In the view of the hearing officer the DOE did not provide Amber with FAPE. The author's opinion is that the issue of the appropriateness of the program offering provided to Amber by DOE and DOH was not the subject of the hearing. As a result the standard of IDEA as determined by Rowley was never addressed in due process. The effect of this ruling going unchallenged is, in the opinion of the author, to establish a maximize benefit standard for service arrangements in the state of Hawaii.

Having said that, the potential to have this case go forward as a model for other parents to follow is not, in the opinion of the author, good public policy. Similarly, if the lesson the DOE and DOH learns as a result of this case is that the way to avoid due process and future litigation is to cause the IEP team to deliver everything the parent requests is the wrong lesson. What clearly is the lesson is that if the arrangements between DOH and DOE are maintained there needs to be a better system of communication and oversight. In addition the message needs to be sent forth that the parent participation requirement component in the IEP team process does not mean abdication to the parent's desires. In the end the FAPE is a mandate for school systems to provide through the IEP what the child reasonably needs with the standard of Rowley as a guide. If the parent disagrees with the services provided they have the option of due process or mediation as a vehicle to address the issue.

2) "Did the DOE discriminate against Amber N. due to her disability?"

The view of the author is that the DOE did not discriminate against Amber N. due to her disability.

3) "Was the DOE's conduct deliberately indifferent to the educational needs of Amber N., a child identified as a child with a disability?"

The record indicates there were errors of omission by DOE. They should have joined the issue and held an IEP session at the January 29, 1999 IEP meeting but at the latest in February of 1999 on the role, function and extent of involvement of Autism Partnership Program in the organization and development of programming for Amber. There were reasons the DOE didn't do that or feel that was necessary. Part of the reason was because of the conduct of one employee from the DOH who acted on her own, didn't advise her

26

supervisors until some time later on and didn't tell DOE at all or tell the parents of her decision. Part of the reason was because the parents did not ask the IEP team to specifically address the issue of securing the Autism Partnership Program as part of the commitment of resources by the IEP. The parents didn't ask even after one of the DOE staff advised them to request an IEP meeting to address that specific issue. Whether these omissions of DOE or DOH raise to the level of deliberate indifference "the conscious or reckless disregard of the consequences of one's acts or omissions," is ultimately left for the courts to decide. In the authors view there were some errors that were made resulting in disconcerting consequences but not to the level of deliberate indifference.

*Respectfully Submitted*
*Joan M. Hawkinson*                                    *July 6, 2004*

The above report constitutes my opinions on the issues under consideration regarding Amber N████'s education as provided by the school system of Hawaii. My opinion and conclusion is based on review of the documents detailed above.

27

# Qualifications

**Education:**
*Specialist Degree Special Education Administration and Supervision, University of Wisconsin, Superior Campus, 2000
*Masters of Science in Education-Lesley College, Boston MA. 1990
*BS degree Special Education –University of Wisconsin Whitewater Campus


**Publications and Appearances:**
*Wisconsin Association of School Business Officials (WASBO), Transportation Issues in Special Education- 2004 annual WASBO conference
*Special Education and Aggressive Children-Methods and Techniques: Presentation Philips Schools August 2003
*Best Practices-Use of Seclusionary Time Out & Physical Restraint with Physically Aggressive Students: Presentation to Conference of Administrators of Special Education, March 2004
*Education and Health Care Services: Lorman Conference Madison, WI., April 2002, & October 2003
*Special Education Plan in Wisconsin, Review of State and Federal Legal References: Presentation Council of Administrators of Special Education Annual Conference, May 2002
*Special Education Law and Practices Eligibility-IEP: Eau Claire Wisconsin, Jan. 2002
*Behavioral/Autism Diagnosis and Treatment Practices: Presentation CESA 5 School Districts 1998, 1999, 2000, 2001, 2002, 2003, 2004.

**Consultations and Independent Educational Evaluations:**
*CESA 5 Multi-Handicapped/ Behavioral/Autism Educational Program Evaluations 1989-Present
*Iola-Scandinavia School District, Behavioral/Autism Consultant 1996-2004
*Wautoma Area School District, Behavioral/Autism Consultant 1996-2004
*Montello Area School District; Behavioral/Autism Consultant 1996-2004
*Chilton School District Behavioral/Autism Consultant 1996-2004
*Williams Bay School District Behavioral/Autism Consultant 1998
*CESA 6 Behavioral/Autism Consultant 1999-2001
*Wisconsin Dells School District Behavioral/Autism Consultant 1999
*Phillips School District Behavioral/Autism Consultant 1998
*Peshtigo School District Behavioral/Autism Consultant 2003
*Marinette School District: System Evaluation of Special Education Programs, Delivery of services, Staffing, Budget and Procedures, 2003-2004
*Stevens Point area School District, Multi Handicapped, Behavioral/Autism Consultant 2001-2004

**Expert Witness:**
*Mauston School District 1996- IDEA Eligibility verses Section 504
*Wisconsin Dells School District 1998-IDEA Eligibility- autism, serious emotional disturbance- appropriate programming
*Williams Bay Schools, 1997-IDEA, LRE Appropriate Program for Student with Autism
*Marinette Schools, 2003- Appropriate Educational Program and Service Arrangements for Seriously Emotionally Disturbed Children

**Positions and Appointments:**
- ED,CD,LD Teacher Wautoma Area Schools
- CD,LD,ED Teacher Westfield Area Schools
- Special Education Program Support Teacher CESA 5
- Special Education Program Services Coordinator CESA 5
- Assistant Director Special Education CESA 5
- Associate Director of Special Education CESA 5
- Autism Consultant CESA 5
- Adjunct Professor Silver Lake College
- Adjunct Professor UW Whitewater
- Adjunct Professor UW Platteville
- Senior Trainer Non Violent Crisis Intervention-National Institute for Crisis Prevention

**Awards:**
- Outstanding Educator Award - Wisconsin Council of Administrators of Special Education 2004 - For significant contributions to the education of children with autism.
- Outstanding Achievement Award – Wautoma Area School District 2004 - In appreciation for the many contributions to the families and teachers of disabled children in the Wautoma Area School District.

29