**ROBERT C. MARVIT, M.D., INC.**
1314 S. King Street, Ste. 759
Honolulu, Hawaii 96814
Telephone: (808) 591-2420
Fax:           (808) 591-2423

May 8, 2001

Re:      N████, AMBER

<u>Memo to File:</u>

Reviewed the medical records from Kaiser which are update on Guy N████. The records from Kaiser are somewhat sparse. In October of '98, he weighed 285 pounds.

His blood pressure was 136/86 and a repeat was 130/70. He was on gout medication, Colchicine, as well as indomethacin and blood pressure medicine, Atenolol, and was advised to resume regular exercise and lose weight. In January 2000, he wanted a clearance to return to work. This was due to increased blood pressure with the City & County physical in November of '99. That tends to be the extent of it.

Deposition of Katherine Sano, taken April 6, 2001: It appeared that she's Mrs. N████'s mother and the purpose of the deposition was to look at expenses, loans, gifts and so forth that had transpired between them. Her husband had died a year previously. She was selling her house and going to move in with the N████. She is a retired school teacher from the DOE in 1995. She described her daughter's stress with having two autistic children and having to cope with strangers and others coming into the house.

The updated Plaintiff's Supplemental Response to Defendant's First Request to Interrogatories on April 18, 2001: To support this window of opportunity, they state that Ron Leaf, at a seminar in 1977 stated that the criteria for recovery is to start before 4 and the prognostic indicators are early age of treatment, type of treatment, and cognitive ability of the child. I would agree with the idea that the earlier the treatment starts, the type of treatment, cognitive ability of the child all are influencing factors of the prognosis. While the brain is neurologically incomplete under the age of 3, the question of the specific lesion or lesions that autism represents is not clear and as such, whether the brain is neurologically still forming or not may be irrelevant.

There's an articulation of the special damages which are the mother's salary, the parents' funds, the husband's deferred compensation and sick leave, among other things. The distress claim is because she had to be the therapist/advocate/teacher/

trainer/data keeper/ human resources person/accountant and consultant for the home program. The discrimination was because other kids got these things and they had to pay for them. That Phyllis Ida failed to let them know that they shouldn't be paying for these things. That she was indifferent deliberately since she was aware of the IEP's recommendation and she let the parents pay for the home component of the program. Basically they are angry at these employees of the DOE who failed to take an active role in giving them the Autism Partnership Home Program resources that they had to supply themselves and didn't get reimbursed until they had a hearing.

The Hawaii Counseling and Education Center update of Amber's care: Apparently was contracted to provide services beginning in September of 1999. The sessions were stopped for a month due to the loss of a family member with some apparent regression despite the retention of receptive and expressive speech apparently. In February of 2000, they were unable to see Amber for most of the month because the extended family was undergoing medical problems. The therapist concluded her internship on August 30, 2000, at which point Amber was able to enter kindergarten at age 5 and follow directives when in the community, feed, clothe and clean up after herself, interact and play appropriately with some prompting. There is nothing unusual about the care provided, which is consistent with the DTT and P.E.C.S. Program outline that had been discussed previously.

Still no definitive documentation about the emotional distress other than the pronouncements in the Interrogatories which really are an indication that the parents, or at least the mother, certainly is one angry person at the way she feels that she's been handled by the DOE.

lm01nahale.45

ROBERT C. MARVIT, M.D., INC.
1314 S. King Street, Ste. 759
Honolulu, Hawaii 96814
Telephone: (808) 591-2420
Fax:           (808) 591-2423

February 14, 2001

Aaron H. Schulaner, Esq.
Deputy Attorney General
235 S. Beretania Street, Room 304
Honolulu, Hawaii 96813

      Re:    PATRICIA N. v. LeMAHIEU
               Civil No. CV00-000252 DAE/LEK

### RECORD REVIEW

### STATEMENT OF THE PROBLEM:

This is a case of a child (Amber N.) who suffers from autism or an autistic spectrum disorder, whose records are being reviewed to answer specific questions regarding her care, interaction with the State agencies (i.e. DOE, DOH) and expert opinions regarding issues in a civil suit by the parents against the State of Hawaii.

### RECORDS REVIEWED:

1. Administrative Hearing Documents:
   A. Chapter 36 Hearing Request dated 8/27/99.
   B. Motion to Dismiss Due to Process Hearing dated 10/14/99.
   C. Petitioners' Opposition to Motion to Dismiss; Exhibit A & Petitioner's Motion in Limine and Memorandum in Support of the Motion in Limine dated 10/14/99 and faxed 10/15/99.
   D. Petitioner's Exhibits for Hearing.
   E. Respondent's Exhibits for Hearing.
   F. Hearing Transcript Vol. I for October 18, 1999.
   G. Hearing Transcript Vol. II for October 19, 1999.
   H. Hearing Transcript Vol. III for October 25, 1999.
   I. Petitioner's Closing Argument.

Aaron Schulaner, Esq.
Re: Amber N.
February 14, 2001
Page 2

      J.    Respondent's Closing Argument.
      K.    Decision and Order dated February 2, 2000.

II.   Civil Case Documents

      A.    Pleadings Vol. I
      B.    Pleadings Vol. II
      C.    Deposition of Beth Schimmenlfennig
      D.    Deposition of Tom Smith
      E.    Expert Reports of Bryan Siegel, Ph.D., and Barbara Bateman, Ph.D., J.D.

In response to your questions:

1. Could Amber have received an appropriate autism program if her IEP had been implemented without the intervention of Autism Partnership?

   Yes. The approach that works best for any child with autism is the one that is most specific to a given child's needs. Children with autism learn in complex ways. Their learning needs, like their autistic symptoms, transform as they develop. To focus on one approach or method of instruction, which might temporarily produce the desired result, may ultimately restrict a child's growth. There is no question that the Discrete Trial Training Program of Autism Partnership is a useful modality but in no way precludes the fact that other services which were being provided were responsive to the child's needs.

2. Did Amber receive an appropriate autism program?

   Yes. She received a wide variety of services, including but not limited to the Discrete Trial Training and as such, there is nothing in the records or the testimony to indicate that she received anything but appropriate services. Children with autism demonstrate highly individualized learning styles and to her credit, she started off at a higher level than many children with autism. One has to be extremely sensitive to the child's reaction tolerance, especially when they are stimulus responsive, but there is nothing in the records to indicate that she received other than appropriate autistic interventions.

3. Do the records suggest that the State or any of its employees intentionally discriminated against Amber or her family on the basis of her disability?

   I have found nothing in the records to suggest or delineate that there was any intentional discrimination against Amber or her family on the basis of her

Aaron Schulaner, Esq.
Re: Amber N.
February 14, 2001
Page 3

disability. In fact, she was welcomed into the program and if anything, represented a recipient of both DOH and DOE services based on immediate eligibility with no apparent direct or indirect restrictions.

4. Do the records suggest that the State or any of its employees were grossly negligent or indifferent to the needs of Amber or her family?

There is no evidence of wanton, willful neglect or indifference to the needs of the family. One could argue that in 1999 when it was brought to their attention that the family had expended large sums of money on these services, some immediate restorative action might have occurred. However, the standard of care in these administrative arenas do not possess the flexibility of response that people who are in private enterprise are able to do, simply as a matter of personal choice. There is no evidence that they were grossly negligent or indifferent to the needs. This is in spite of the complaint that they were inadequately responsive to the needs.

5. Do the records suggest that the father suffered high blood pressure as a result of the allegations in the Complaint?

The records include a complaint that the father suffered high blood pressure as a result of the Complaint. However, I don't have the father's medical records. Having an autistic child can certainly be a stressor, let alone being totally immersed in the child's treatment. Nevertheless, there are many reasons why blood pressure can be elevated, stress being one, so that one could not state with any degree of medical probability that there is a specific causal connection based on the records.

6. If not, what would be necessary to establish such a claim in your medical opinion (i.e., IME, medical records, personnel records)?

In order to establish such a claim, in my medical opinion, requires a review of medical records, personnel records, treatment and possibly an independent medical examination.

7. Do the records suggest that either the mother, father, or Amber suffered emotional distress as a result of the allegations in the Complaint?

The records may suggest stress but on this alone, a medical diagnosis is unwarranted.

Aaron Schulaner, Esq.
Re: Amber N.
February 14, 2001
Page 4

8.  If not, what would be necessary to establish such a claim in your medical opinion (i.e., IME, medical records, depositions of the individuals)?

    In order to establish such a claim, psychiatric or psychological treatment for the parents, family therapy or other medical records would be appropriate, depositions articulating the nature and quality of this emotional distress and possibly independent psychiatric evaluation would be warranted in order to substantiate or effectively refute such a claim.

Upon my review of the records, it would appear that the major complaint rests on the family not being appropriately compensated for the expenditures made for the Discrete Trial Training or applied behavior analysis developed for them by Ron Leaf. The program which was set up independent of that, appears to be focused on approaches that try to move the child along a developmental track that focuses on relationships and communication. This includes communication enhancement activities, as well as increasing functional skills to enhance independence. I would agree that high-powered early intervention is useful, but this so-called "window of opportunity" is not either of short duration or of substantive merit when it comes to outcome studies of the multiple modalities that have been applied to autism. In fact, the list of treatments that have been applied to autism ranges from nutritional vitamin factors to various behavioral, pharmacological, dietary and even hyperbaric oxygen modalities. Play therapy, music therapy, immunotherapy, craniosacral therapy, biofeedback, detoxification for heavy metals, all have been proposed, tried and have their proponents.

The treatment that Amber received is really fundamental and appropriate and has, at least from a research point of view, irrespective of the investigator, demonstrated benefit.

If you have any further questions about this, please let me know.

Sincerely yours,

Robert C. Marvit, M.D.

RCM:mk

cme1q01amber.07